# 24-159-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

———— ▸▸◂◂ ————

TRIREME ENERGY HOLDINGS, INC., TRIREME ENERGY DEVELOPMENT, LLC,

*Plaintiffs-Appellants,*

*v.*

INNOGY RENEWABLES US LLC, INNOGY SE,

*Defendants-Appellees,*

*v.*

CASSADAGA WIND LLC,

*Defendant.*

————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

John F. Baughman
Nathaniel E. Marmon
BAUGHMAN KROUP BOSSE PLLC
*Attorneys for Plaintiffs-Appellants*
One Liberty Plaza, 46th Floor
New York, New York 10006
212-548-3212



## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Plaintiffs-Appellants Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC state as follows:

Plaintiff Trireme Energy Holdings, Inc. is a Delaware corporation. There are no publicly held corporations holding 10% or more of Trireme Energy Holdings, Inc.'s stock.

Plaintiff Trireme Energy Development, LLC is a limited liability company, whose sole members are Trireme Energy Holdings, Inc. and James Spencer.

**TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUE PRESENTED ....................................6

STATEMENT OF THE CASE............................................................7

I.     Background ...........................................................................8

       A.    The Parties .................................................................8

       B.    Renewable Energy Tax Credits ..................................8

       C.    The Merger Agreement ...............................................9

II.    Trireme's Good Faith and Fair Dealing Claim .................11

       A.    The Cassadaga Project.............................................11

       B.    Construction of the Cassadaga Wind Farm.............12

       C.    The Covid Shutdown ................................................13

       D.    The Safe-Harbor Extension .....................................13

       E.    RWE's Takeover of IRUS and the Cassadaga Project...........14

       F.    The Cassadaga Project Remains on Schedule for
             2020 COD After the Covid Shutdown ......................15

       G.    IRUS Arbitrarily and Irrationally Changes the
             Cassadaga COD  to 2021........................................16

       H.    IRUS Avoids the $69.7 Million Cassadaga Milestone Payment ............19

       I.    The Trial Court's Erroneous Ruling in Favor of IRUS...........................20

SUMMARY OF THE ARGUMENT ...............................................22

ARGUMENT ...................................................................................24

I.     Standard of Review..............................................................24

II.    IRUS Had an Obligation to Exercise Its Discretion Under the Merger
       Agreement in Good Faith......................................................24

III.   The Record Establishes that IRUS Abused Its Discretion
       and the District Court Erred in Relying on Hindsight to
       Conclude Otherwise............................................................30

       A.    The Abuse-of-Discretion Standard............................30

B.   IRUS Abused Its Discretion by Changing Cassadaga's COD Without a Rational Basis ........................................................................35

C.   The District Court Erred by Substituting Its Own Judgment when Evaluating IRUS's Decision to Delay the Cassadaga COD ...................38

CONCLUSION .........................................................................................43

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Water Techs. v. Amiad U.S.A., Inc.*,
  457 F. Supp. 3d 313 (S.D.N.Y. 2020) ....................................25

*African Diaspora Mar. Corp. v. Golden Gate Yacht Club*,
  109 A.D.3d 204 (1st Dep't 2013) .........................................32

*Beck Chevrolet Co. v. Gen. Motors LLC*,
  787 F.3d 663 (2d Cir. 2015) ...............................................24

*Calcutt v. Fed. Deposit Ins. Corp.*,
  598 U.S. 623 (2023)..........................................................35

*Chem. Specialties Mfrs. Ass'n v. Jorling*,
  85 N.Y.2d 382 (1995) ........................................................34

*Cordero v. Transamerica Annuity Serv. Corp.*,
  211 N.E.3d 663 (N.Y. 2023)................................................21

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ............................................2, 23, 31, 32

*Dalton v. Educ. Testing Serv. of Princeton, N.J.*,
  155 Misc. 2d 214 (Sup. Ct. Queens Cnty. 1992),
  *aff'd*, 87 N.Y.2d 384 (1995) ..............................................32

*Deegan v. City of Ithaca*,
  444 F.3d 135 (2d Cir. 2006) ...............................................24

*Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*,
  2005 WL 352137 (S.D.N.Y. Feb. 15, 2005) ............................30

*Figel v. Dwyer*,
  75 A.D.3d 802 (3rd Dep't 2010) ..........................................35

*Fishoff v. Coty Inc.*,
  634 F.3d 647 (2d Cir. 2011) ...............................................25

*Heintz v. Brown*,
   80 N.Y.2d 998 (1992) ..........................................................................3, 23, 30, 38

*Hirsch v. Food Res., Inc.*,
   24 A.D.3d 293 (1st Dep't 2005) ...............................................................25

*Man Ferrostaal, Inc. v. M/V Akili*,
   704 F.3d 77 (2d Cir. 2012) ........................................................................24

*Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*,
   190 F.3d 64 (2d Cir. 1999) .........................................................................24

*Moran v. Erk*,
   11 N.Y.3d 452 (2008) .................................................................................26

*N.Y. Univ. v. Cont'l Ins. Co.*,
   87 N.Y.2d 308 (1995) .................................................................................25

*N.Y.C. Dep't of Sanitation v. MacDonald*,
   215 A.D.2d 324 (1st Dep't 1995), *aff'd*, 87 N.Y.2d 650 (1996) .......................34

*Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*,
   35 A.D.3d 563 (2d Dep't 2006) ..................................................................25

*S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*,
   520 F. Supp. 3d 497 (S.D.N.Y. 2021) .............................................23, 25, 26, 33

*Scherbyn v. Wayne-Finger Lakes Bd. of Co-op. Educ. Servs.*,
   77 N.Y.2d 753 (1991) ...............................................................................3, 34

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
   769 F.3d 807 (2d Cir. 2014) ..............................................................2, 23, 32

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)....................................................................................35

*Spinelli v. Nat'l Football League*,
   903 F.3d 185 (2d Cir. 2018) ......................................................................25

*Streety v. Annucci*,
   203 A.D.3d 1509 (3rd Dep't 2022) .............................................................35

iv

*Toledo Fund, LLC v. HSBC Bank USA, Nat. Ass'n*,
   2012 WL 2850997 (S.D.N.Y. July 9, 2012) ........................................30

*Trump-Equitable Fifth Ave. Co. v. Gliedman*,
   57 N.Y.2d 588 (1982) ..............................................................23, 34, 35

*Tymshare, Inc. v. Covell*,
   727 F.2d 1145 (D.C. Cir 1984) ..........................................................26

**Statutes**

5 U.S.C. § 706(2) .......................................................................................35

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332 .........................................................................................1

CPLR § 7803 ..............................................................................................33

**Other Authorities**

Black's Law Dictionary (6th ed. 1990) .....................................................30

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC (collectively, "Trireme") filed this action to recover for breach of contract from Defendants-Appellees Innogy Renewables US LLC ("IRUS") and Innogy SE. The District Court had subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because Appellants are citizens of Delaware and Pennsylvania and Appellees are citizens of Germany, and because the amount in controversy exceeds $75,000 exclusive of interest and costs.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered judgment in the action on December 14, 2023, and Appellants filed a timely notice of appeal on January 12, 2024.

## INTRODUCTION

Trireme argued at trial that IRUS breached the implied covenant of good faith and fair dealing by acting arbitrarily and irrationally in exercising discretion under the parties' contract. In its post-trial opinion and order, the District Court failed to adequately address the issue and, as a result, applied the wrong law. This Court should reverse and clarify the applicable standard.

Under New York law, a party abuses its discretion—and breaches the implied covenant—if it acts arbitrarily or irrationally. Decisions of the Court of Appeals and Second Circuit make clear that the contractual abuse-of-discretion standard is

subjective: a trial court reviewing a party's exercise of discretion does not look back to determine whether, with the benefit of hindsight, the party's decision was objectively reasonable. Instead, the trial court must ask whether, at the relevant time, the party exercised its discretion in good faith or in an arbitrary and irrational manner. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 392 (1995); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 820 (2d Cir. 2014).

In *Dalton v. Educational Testing Service*, the Court of Appeals addressed this exact issue. The Supreme Court and the Appellate Division both concluded that the defendant breached its duty of good faith and fair dealing because it failed to consider relevant information—not because the defendant reached the wrong conclusion. *See* 87 N.Y.2d at 389. In affirming, the Court of Appeals made clear that "[t]he critical question then is whether the [defendant] ***made any effort to consider this relevant information*** submitted by [the plaintiff]." *Dalton*, 87 N.Y.2d at 391 (emphasis added). The question was *not* whether, in hindsight, the facts ultimately supported the conclusion reached. Regardless of whether the outcome is correct and regardless of whether the contracting party is *otherwise* acting in good faith, it cannot abdicate its duty to make rational decisions based on a contemporaneous evaluation of the relevant facts. Such abdication—in and of itself—results in an arbitrary and irrational exercise of discretion, which is a stand-alone violation of the implied covenant, even where there is no other evidence of

2

bad faith. *See Heintz v. Brown*, 80 N.Y.2d 998, 1001 (1992) (under New York law, an arbitrary action is one that is "without sound basis in reason and is generally taken without regard to the facts").

Indeed, this is a familiar standard that courts routinely apply when evaluating abuse of discretion in the administrative-law context, where the Court of Appeals has held that "the court is powerless to affirm the [arbitrary or irrational] administrative action *by substituting what it considers to be a more adequate or proper basis*." *Scherbyn v. Wayne-Finger Lakes Bd. of Co-op. Educ. Servs.*, 77 N.Y.2d 753, 758 (1991) (emphasis added).

The District Court failed to apply this standard. In finding that IRUS did not abuse its discretion, the District Court did not consider the undisputed evidence showing that, *at the relevant time*, IRUS lacked any rational basis for exercising its discretion. Instead, the court improperly substituted what, in hindsight, it believed to be an adequate basis for reaching the same conclusion. In substance, the Court decided that because—in its view—IRUS did not affirmatively act in bad faith, IRUS *necessarily* satisfied its duty of good faith with respect to the process by which it exercised its discretion. That was reversible error.

Here are the facts: In 2017, Trireme sold a portfolio of renewable-energy projects to IRUS pursuant to a "Merger Agreement." IRUS agreed to pay an up-front amount of $50 million, plus up to $112.2 million in "Milestone Payments" or

3

"earn-out" fees. The most valuable project in the portfolio was a windfarm called Cassadaga. IRUS agreed to pay Trireme a $69.7 million earn-out fee if the Cassadaga project achieved "commercial operation" by December 31, 2020. This was the single largest component of the total consideration for the entire portfolio. It is undisputed that, when the parties signed the agreement, the December 31, 2020 deadline was chosen because the project could qualify for extremely valuable tax credits only if it achieved commercial operation by that date. Because of the tax deadline, IRUS had incentive to complete the project on time and pay the earn-out fee to Trireme.

The Treasury Department changed the applicable rules in May 2020 in response to the Covid-19 pandemic, extending Cassadaga's tax deadline by one year. As a result, Cassadaga would still qualify for its anticipated tax credits if it achieved commercial operation by December 31, 2021—a year *after* the earn-out expired. Not surprisingly, that's exactly what happened. IRUS completed the project in 2021, received the anticipated tax credits, but did not pay the earn-out fee. This was a windfall for IRUS.

Trireme sued IRUS for breach of the covenant of good faith and fair dealing, alleging that IRUS exercised its discretion over the schedule for Cassadaga arbitrarily and in bad faith. Put simply, Trireme alleged that IRUS took advantage of the pandemic to reap a $69.7 million windfall at Trireme's expense. The case

4

went to trial in November 2023.

At trial, the evidence showed that, although construction of Cassadaga was initially delayed by the pandemic, the project recovered and remained on schedule for a commercial operation date ("COD") in 2020. But in late August, a mid-level employee suddenly suggested delaying Cassadaga's COD, and in September, IRUS changed the target COD from December 31, 2020, to March 5, 2021. IRUS had no rational basis for this decision, and its witness gave none.

IRUS's principal trial witness was John Badeusz, an executive with supervisory responsibility for construction of windfarms throughout the United States. Mr. Badeusz was the person primarily responsible for approving any change to Cassadaga's target COD. It is undisputed that such a change could not be made without management approval.

Yet during his examination at trial, Mr. Badeusz made clear that he had no idea why Cassadaga's COD had been changed from 2020 to 2021. He saw no relevant analysis, received no relevant information, and couldn't explain the basis for the change. His testimony laid bare a textbook abuse of discretion.

Consequently, in its closing argument and post-trial papers, Trireme argued that IRUS abused its discretion by acting arbitrarily and irrationally in changing the COD. But in its post-trial opinion and order, the District Court focused almost exclusively on a different issue—whether IRUS purposely delayed the completion

of Cassadaga to avoid the earn-out payment. Because it focused on *that* issue, the Court limited its analysis of the abuse-of-discretion standard to one generic quote. It cited no other law on point, and it engaged in no analysis of the applicable standard. As a result, the District Court erroneously substituted its own post-hoc judgment in evaluating whether IRUS abused its discretion. Indeed, in concluding that IRUS exercised its discretion in good faith, the court did not cite *any* testimony about what IRUS management actually did—or didn't do—before changing Cassadaga's COD to 2021. Instead, the court cited evidence about delays and challenges that affected the project, and then concluded that IRUS acted reasonably in deciding to change the COD. As to whether IRUS exercised its discretion in good faith—that is, whether IRUS's decision making process was adequate—the court engaged in impermissible hindsight. The court thus erred as a matter of law.

## STATEMENT OF THE ISSUE PRESENTED

1.    Whether the District Court erred as a matter of law in substituting its own judgment to conclude, in hindsight, that Appellees' exercise of discretion was not arbitrary or irrational, in violation of the implied covenant of good faith and fair dealing under New York law.

6

## STATEMENT OF THE CASE

Trireme and IRUS entered into an agreement on December 21, 2017 (the "Merger Agreement"), under which Trireme agreed to sell certain assets to IRUS for an up-front payment of $50 million, plus up to $112.2 million in additional earn-out amounts. A2453 § 3.1. Trireme sued IRUS on June 30, 2020, for breach of the Merger Agreement and sued its subsidiary Cassadaga Wind LLC for tortious interference. A38. Trireme amended its complaint on July 14, 2020, to add a declaratory-judgment claim against IRUS's parent company, Innogy SE. A61.

On January 13, 2021, Trireme amended its complaint, with Innogy's consent, to add claims for breach of the duty of good faith and fair dealing, reformation, and unjust enrichment. A226. In an order dated August 17, 2021, the District Court dismissed Trireme's claims for reformation, unjust enrichment, and tortious interference, but sustained Trireme's claim for breach of the duty of good faith and fair dealing. A260.

Beginning on November 13, 2023, the District Court presided over a five-day bench trial of Trireme's remaining claims for breach of contract, breach of the duty of good faith and fair dealing, and declaratory judgment. In findings of fact and conclusions of law dated December 14, 2023, the District Court found for IRUS on all claims, A6074, and the Court entered judgment on the same day, A6127.

Trireme appeals the District Court's judgment, rendered after trial, that IRUS

did not breach the covenant of good faith and fair dealing.  A6128.

## I.  Background

### A.  The Parties

EverPower Wind Holdings, Inc. ("EverPower") was a renewable-energy company owned by Trireme.  A1277:18-25.  EverPower developed, built, and operated wind and solar energy projects.  *Id.*

In 2017, Trireme sold EverPower's portfolio of projects in development to IRUS, the U.S. subsidiary of German energy company Innogy SE.  A1287:14-17. In July 2020, IRUS was acquired by RWE Renewables Americas, LLC ("RWE"), the U.S. subsidiary of another German energy company.  A1437:21-1438:2; A1979:21-22.

### B.  Renewable Energy Tax Credits

To encourage investment in the development of renewable energy, Congress has historically given substantial tax credits to qualifying renewable-energy projects. A1581:14-1582:10.  Without some form of tax credit or government grant, renewable-energy projects would not have been profitable and thus would not have been economically feasible to build.  A1582:11-1583:6.[1]

---

[1]  *See also* A3122 at 222:8-223:6 ("Tax credits were critical to the economics of all of the renewable projects that [IRUS CEO Andrew Young] worked on at IRUS" and "all of the U.S. projects that [he] built or operated in [his] career would not have been built without the availability of renewable energy tax credits."); A2700 at 194:6-15 ("Q.  So are you aware of any projects that did not receive, US renewable projects that did not receive either tax credits or government grants

8

To qualify for tax credits, renewable-energy projects needed to meet certain requirements. As relevant here, a wind-farm project built with turbines purchased in 2016 ("safe-harbor" turbines) would qualify for full tax credits only if the project achieved commercial operation no later than December 31, 2020. A1280:13-1282:11. If a 2016 project missed that deadline, it would not qualify for the tax credits—worth about one-third of the project's overall value. A1583:25-1585:25.[2] These tax-qualification rules were well known in the renewable-energy industry, including by IRUS and RWE senior executives and employees. *See, e.g.*, A2019:13-24 (Rodriguez); A2780 at 142:2-23 (Ortin-Rios); A3076 at 38:4-9 (Young); A3018 at 63:3-20 (Walton).

## C.    The Merger Agreement

In 2016, IRUS purchased about $60 million worth of "safe harbor" wind turbines. A1971:4-12; A3076 at 38:18-39:11. IRUS entered into negotiations with Trireme in 2017 to purchase EverPower's development pipeline of three dozen

---

but were still financially viable or economically viable? A. I don't know all US renewable projects. Within my personal involvement, I did not see any of these projects."); A2772 at 62:1-6 (Ortin-Rios: "Q. And you agree that tax credits . . . would be critical to the economics of every U.S.-based renewable project that you've ever worked on. Right? A. I believe so.").

[2]    In 2015, Congress passed legislation that phased out the renewable-energy tax credits. Under that legislation, the full amount of potential tax credits would be available to projects that began construction in 2016, but the tax credits would decrease by 20 percent in each of the next three years. Projects that began construction in 2020 would receive no tax credits at all. A1618:25-1619:5.

renewable-energy projects, which included projects that could potentially achieve commercial operation by December 31, 2020, and thus qualify for tax credits using IRUS's 2016 turbines. A1287:18-22; A1971:16-1972:2; A3075 at 36:10-14. The parties called the deal "Project Aura." A1287:18-22; A1869:6-8; A3073 at 29:11-14. It is undisputed that tax credits were "a major driver of value for Project Aura," A3126 at 238:14-19, and indeed "fundamental" to the parties' negotiations, A1291:22-25; A3144 at 317:3-11; A3154 at 351:5-12.

On December 17, 2017, Trireme and IRUS entered into an agreement for the purchase of EverPower's development projects (the "Merger Agreement"). A2432. IRUS agreed to pay Trireme an up-front amount of $50 million, *plus* up to $112.2 million in "Payment Milestones Amounts" associated with IRUS's development or other exploitation of each project. A2453 § 3.1.[3] The parties referred to these amounts as "earn out" payments. *E.g.*, A1447:19-24.

The earn outs were a significant part of the compensation that Trireme expected to receive for the Aura portfolio. The potential earn-out payment for the Cassadaga project alone (the "crown jewel" of the pipeline) was $69.7 million. A2564-2567.

---

[3] Although the Merger Agreement was amended multiple times, the Payment Milestone provisions were not changed in a way that is relevant to this action. *See* A2572; A2637. As at trial, we cite to the original agreement for simplicity.

10

The Merger Agreement required IRUS to develop certain "Key Projects," which included Cassadaga, using commercially reasonable efforts, but otherwise vested IRUS with "sole discretion" over the projects "and the schedule therefore":

> From and after Closing Date, Purchaser [IRUS] shall use commercially reasonable efforts to cause the Company and the applicable Development Companies to continue to develop the Key Projects in accordance with the applicable standards of care set forth on Annex 2. Subject to the preceding sentence, the details and manner of such development efforts and the schedule therefor shall be within the sole discretion of Purchaser.

A2483 § 7.6(a).

## II.     Trireme's Good Faith and Fair Dealing Claim

### A.     The Cassadaga Project

When the parties negotiated the Merger Agreement, Cassadaga was a proposed 125.5-megawatt wind farm in upstate New York. A1284:10-12. Cassadaga was in the late stages of development, and it had already entered into valuable "power purchase agreements," under which the project would sell the electricity that it generated. A1286:10-20; A1297:17-22. Cassadaga was thus the most valuable project in the Aura development pipeline. A1294:6-14; A1297:17-19; A1565:18-1566:1.

To fully realize that value, Cassadaga needed to qualify for the 2016 tax credits, and the parties mutually understood that Cassadaga would qualify for the tax credits *only* if it achieved commercial operation before December 31, 2020—the tax qualification deadline. A3144 at 317:3-11. This was "fundamental" to the deal

11

when negotiated. A1291:22-25; A3154 at 351:5-12. Consequently, as to Cassadaga, IRUS agreed to pay Trireme a Payment Milestone Amount of $69.7 million if IRUS built the Cassadaga Project and reached its Commercial Operation Date ("COD") by December 31, 2020. A2447.

Thus, when they executed the Merger Agreement, the parties' interests were aligned on achieving commercial operation of Cassadaga by December 31, 2020—Trireme for the milestone payment, and IRUS for tax-credit qualification.

### B.    Construction of the Cassadaga Wind Farm

Wind farms are large systems in which a connected set of wind turbines transmits power to the electrical grid. A1651:9-1652:2. Building a wind farm generally takes around 6 to 9 months. A1657:23-1658:2. The process requires active management and oversight. A1641:23-1642:8. As with other large-scale construction projects, wind-farm project managers typically rely on detailed schedules and budgets to coordinate work and manage costs. A1639:19-1648:21; A2204:24-2205:11; A3004 at 8:11-9:5.

Even with active management, unexpected delays are common in large-scale projects. A1282:14-20; A1658:14-18; A2199:3-2200:3. Projects thus routinely rely on schedules with built in buffer—known in the industry as "float"—to absorb delays. A1649:22-1650:15. Project managers also have standard strategies for mitigating delays, including "acceleration" methods for increasing the pace of

construction to get back on schedule.  A1282:21-1283:8; A1666:3-17; A2201:5-12. To determine whether to implement acceleration after a delay, a prudent project manager will conduct a cost-benefit analysis of available acceleration strategies. A1642:22-1643:9;  A1665:16-1666:2;  A2201:13-20.    Indeed, RWE's head of construction, John Badeusz, testified that after a significant delay, he would expect a ***written*** cost-benefit analysis.  A2201:21-2202:16.

### C.    The Covid Shutdown

Construction on the Cassadaga project began in late December of 2019. A1403:12-15. As of March 31, 2020, the Cassadaga Project was on budget, and on schedule for COD in December 2020.  A3846.  The next month, due to Covid, New York State shut down virtually all construction at Cassadaga from April 7, 2020, until May 19.  A1765:22-1766:3; A2823 at 73:8-16; A2858 at 211:4-23; A3009 at 26:2-17; A3809.   Nevertheless, when the shutdown ended, IRUS anticipated that Cassadaga would still achieve COD by December 31, 2020.  A4230; A4901.

### D.    The Safe-Harbor Extension

In response to the Covid pandemic, on May 27, 2020, the U.S. Treasury Department extended the tax-qualification deadline by one year for facilities—like Cassadaga—built with 2016 safe-harbor turbines.  A4207.  Consequently, Cassadaga could achieve COD in 2021, and still qualify for its tax credits.  Because of that extension, the parties' interests were no longer aligned as to Cassadaga's

13

schedule.  By achieving COD in 2021, IRUS could obtain the anticipated tax credits but avoid paying the $69.7 million earn-out to Trireme.

### E.    RWE's Takeover of IRUS and the Cassadaga Project

RWE acquired IRUS, and assumed responsibility for the Cassadaga Project, on July 1, 2020.  A1859:22-1860:2; A1895:11-13; A2050:11-17.  RWE Americas's Chief Operating Officer, Silvia Ortin-Rios, became the most senior person at RWE with responsibility for the Cassadaga Project.   A2794 at 286:20-287:8.   RWE Americas' head of construction for onshore wind, John Badeusz, assumed supervisory responsibility for construction of the Cassadaga project, and he reported to Ms. Ortin-Rios.  A2050:11-2051:4.

Ms. Ortin-Rios testified that she never read, or even saw, the Merger Agreement between IRUS and Trireme.  A2777 at 84:18-85:5.  She did not know who was responsible, as of July 1, 2020, for ensuring that RWE complied with its obligations as the successor to IRUS under the Merger Agreement.  A2778 at 87:2-14.

Similarly, after RWE took over management of the Cassadaga Project, nobody advised Mr. Badeusz about IRUS's contractual obligations to Trireme under the Merger Agreement, and he did not review the Merger Agreement at that time.  A2208:5-14.  After taking responsibility for the project, Mr. Badeusz did not take any action in 2020 specifically to comply with IRUS's contractual obligations to

14

Cassadaga's seller.  A2210:19-2211:2.

### F.  The Cassadaga Project Remains on Schedule for 2020 COD After the Covid Shutdown

According to uncontradicted testimony from Mr. Badeusz, Cassadaga was on budget and on schedule as of March 2020—that is, *before* the Covid shutdown. A2190:6-25; *see* A3846.  He also testified that the project was on budget and on schedule as of June 2020—that is, *after* the Covid shutdown.  A2206:9-16; *see* A4294.  Other defense witnesses gave similar testimony.  A2743 at 368:9-369:8.

Indeed, contemporaneous documents and trial testimony confirm that Cassadaga remained on schedule throughout that summer.  For example:

- On July 8, 2020, Mr. Badeusz wrote that "[a]ll construction work has resumed and recovery from shut down delay is expected and subsequent *Q4 2020 COD remains the forecast*."  A4901 (emphasis added).  A4901.  Mr. Badeusz testified that "Expected COD: Q4 2020" meant "based on the best available information to me that *this was our projected COD*."  A2059:13-15 (emphasis added).

- On July 16, 2020, Cassadaga's civil contractor, JBS, provided RWE a schedule under which Mr. Badeusz testified that a 2020 COD *was achievable*.  A2152:24-2153:16 (emphasis added).

- On July 28, 2020, Mr. Badeusz wrote, "based on the best available information [he] had . . . at that time," that "Current view COD: 12/30/2020."  A2069:13-20; A4317.

- Mr. Badeusz further testified that a 2020 COD was "consistent with [his] memory . . . as to what the base case was for Cassadaga in the late July 2020 time frame."  A2070:6-2071:3.

- In mid-August 2020, JBS [a key contractor] experienced problems when pouring the first turbine foundation at Cassadaga.  Mr. Badeusz testified that "although JBS was slow to get that first foundation poured,

15

they were going to implement [acceleration] measures, and ***they would get back on track with the schedule***." A2112:4-8 (emphasis added).

**G.     IRUS Arbitrarily and Irrationally Changes the Cassadaga COD to 2021**

Although the Cassadaga project was still on schedule, in September 2020, IRUS management arbitrarily changed the project's commercial operation date to March 5, 2021—a decision that cost Trireme $69.7 million.

The project manager for Cassadaga was Jeffrey Puterbaugh. A2095:13-16. It was Mr. Puterbaugh's job to manage the project's schedule. A2203:19-24; A2204:18-23. But it is undisputed that Mr. Puterbaugh lacked the authority to change the project's commercial operation date on his own. As he testified, "I needed to get buy-in on that. That was not something I could unilaterally change." A2856 at 203:19-204:23. Indeed, he testified that it was his job "to achieve COD at the Cassadaga project by the date set by management, *unless and until management changed the COD*." *Id.* (emphasis added). It was thus the sole responsibility of IRUS management make such a change.

On August 24, 2020, Mr. Puterbaugh wrote an email to Mr. Badeusz in which he said, "Given the current status, I ***feel*** we should officially change the scheduled COD date for Cassadaga to sometime in 2021." A4335 (emphasis added). Mr. Badeusz responded: "You need to provide ***much more detail*** on your new estimate of Cassadaga COD than 'sometime in 2021.' . . . The new forecast date

16

would need to be supported with a ***great deal more detail***." *Id.* (emphasis added).

Mr. Puterbaugh testified that, when he sent the August 24 email, he "***felt*** that we were at a point where COD was just highly—becoming highly improbable to happen before December 31, 2020." A2944 at 583:2-9 (emphasis added). But Mr. Puterbaugh *never* provided "a great deal more detail" to Mr. Badeusz to justify that feeling, as his boss requested. At trial, Mr. Badeusz did not recall "ever receiving any form of written analysis from Mr. Puterbaugh as to why the COD date should be changed from December 31, 2020, to some other date." A2258:6-9. He could not identify a single document where Mr. Puterbaugh gave him "an analysis with a great deal more of detail" about the change, and Mr. Badeusz himself "did not prepare an analysis with [a] great deal of detail supporting the change in COD from December 31, 2020." A2261:2-9. He could not recall anyone that prepared such an analysis. A2261:10-11.

Indeed, Mr. Badeusz had "no specific recollection of what Mr. Puterbaugh did to make his recommendation to change the COD date," did not know "who else Mr. Puterbaugh spoke to about changing the COD date," and did not "know what documents [Mr. Puterbaugh] looked at, actually, in coming to that conclusion." A2259:14-23. Mr. Badeusz did not recall any discussion with Mr. Puterbaugh between August 24 and September 1 concerning setting a new COD for Cassadaga. A2257:18-24. He did not know if he talked to anyone other than Mr. Puterbaugh

17

about moving the COD to March 5, 2021. A2260:3-10. He had no basis for understanding why COD was changed to March 5, 2021, and he had no recollection of what information was available to him at the time the decision was made to move the COD to March 5, 2021. A2258:10-24.

According to Mr. Badeusz—who testified as both a fact witness and as defendants' construction-management expert—the *only* issue "that would have given rise to a delay in the schedule as of August 24, 2020" was "the first foundation pour"—that is, pouring concrete for the first wind turbine foundation under construction A2254:23-2255:5.[4] But Mr. Badeusz also testified that the relevant contractor had already agreed to overcome any delay caused by adding equipment and manpower to accelerate its work. A2108:3-7; A2244:15-2245:7; A4329-4330. And, to be clear, neither Mr. Badeusz nor any other witness testified that RWE changed Cassadaga's COD *because of* the first foundation pour. Mr. Badeusz's testimony on this point was pure hindsight.

Like Mr. Badeusz, RWE Chief Operating Officer Silvia Ortin-Rios did not give *any* reason for changing the COD from December 31, 2020, to March 5, 2021. A2800 at 319:21-320:2. She did not recall who told her about the change. A2800

---

[4] At his deposition, Mr. Badeusz could not remember ***any*** issues that would have given rise to a delay in the schedule as of August 24, 2020. A2255:15-21; A2256:2-8.

at 320:3-6. She did not remember "discussing the change of projected COD for Cassadaga with Mr. Badeusz at any time." A2800 at 320:23-321:2. She did not remember responding in any way when she found out about the change, or whether she took steps to accelerate construction rather than change the COD. A2801 at 324:2-325:1.

Remarkably, it is unclear exactly when IRUS changed Cassadaga's COD. A4339. Because of the utterly deficient decision-making process, the evidence does not contain a written record of who officially changed the COD, how it was changed, or when. The details are a mystery. Yet IRUS did change Cassadaga's COD to 2021 at some point in September 2020. A4487.

In sum, there was no evidence at trial that IRUS management conducted *any* analysis before pushing Cassadaga's COD into 2021. Its decision was irrational.

**H. IRUS Avoids the $69.7 Million Cassadaga Milestone Payment**

Having changed the COD, the Cassadaga project did not achieve commercial operation until 2021. A2135:4-8. Consequently, IRUS did not pay Trireme the $69.7 million earn-out payment for Cassadaga. A2034:1-6. Yet the project still qualified for its full anticipated tax credit, which IRUS monetized through "tax-equity financing" commonly used by developers in the renewable energy industry. A1948:5-16; A1603:16-1604:19. IRUS thus received the full benefit of its bargain with respect to Cassadaga, while Trireme did not receive the agreed-on earn out.

19

## I.  The Trial Court's Erroneous Ruling in Favor of IRUS

The District Court presided over a five-day bench trial.  A1189-2336.  Given the evidence at trial, Trireme argued at closing and in its post-trial briefs that IRUS arbitrarily and irrationally exercised its discretion when changing Cassadaga's COD.  A2352:10-2356:7; A2369:3-18; A5984-5988.  The District Court issued an opinion and order finding in IRUS's favor on Trireme's claim for breach of the covenant of good faith and fair dealing.  A6074.

In its opinion and order, the District Court focused primarily on arguments about good faith and fair dealing that Trireme did not make in its closing or post-trial briefs.  In particular, the Court focused on whether IRUS delayed the construction of Cassadaga, or slacked off, to purposely deprive Trireme of the $69.7 million earn-out fee.  A6107-6119.  As to that question, the Court concluded that the evidence did not support a finding that IRUS acted in bad faith.  A6119.

In focusing on that issue, the court gave little attention to Trireme's principal argument at trial—that IRUS management abused its discretion because it failed to undertake *any* analysis of the Cassadaga schedule before approving a change of COD to 2021.  This is a separate and distinct question from whether IRUS purposely delayed the project.  Regardless of the outcome of the process, IRUS had a duty to exercise its discretion as to the schedule in good faith, by analyzing relevant facts and developing a rational justification for its actions.  The court failed to address this

20

significant aspect of IRUS's good-faith obligation.

In reciting the applicable law on the implied covenant of good faith and fair dealing, the District Court acknowledged that "[w]here the contract contemplates the exercise of discretion, [the duty of good faith and fair dealing] includes a promise not to act arbitrarily or irrationally in exercising that discretion." A6105 (quoting *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023)) (alterations in original). The court provided no further explanation or analysis of the law governing the exercise of contractual discretion. *See id.* In particular, the court cited no law defining an arbitrary or irrational exercise of discretion or explaining the standard that courts apply in making such determinations. *See id.*

As to abuse of discretion, the District Court found: "Plaintiff's suggestion that RWE acted 'without sound basis in reason and without regard to relevant facts' when it ultimately determined that the COD would likely move to 2021 mischaracterizes the deliberation with which Defendants monitored Cassadaga's progress, considered ways to speed up construction, and eventually decided to adjust their timeline." A6110. The court cited evidence about delays experienced during the construction of the Cassadaga, including delays caused by Covid. A6110-6111. The court discussed certain efforts to accelerate construction. A6111. And the court quoted Mr. Badeusz's testimony that "if somebody had a silver bullet to create a solution for all the problems we encountered on that project, I would have bought

21

it." A6111.  The court then concluded that  "[a]gainst this backdrop, the decision to push the project's official COD to 2021 was reasoned and deliberate.  Plaintiffs cannot attribute arbitrariness to a decision while ignoring the full set of experiences and analysis on which it rested."  A6111.

In reaching its conclusion, the District Court cited none of Mr. Badeusz's testimony about his failure to obtain information or analysis about the change of COD.  Indeed, the court cited no evidence at all about the factors actually considered by IRUS management in making the decision, or the analysis actually performed (because there was no such evidence).  Instead, the District Court applied the wrong legal standard, and consequently substituted its own judgment for IRUS management in concluding erroneously that IRUS acted in good faith.

## SUMMARY OF THE ARGUMENT

By its terms, the Merger Agreement gave IRUS "sole discretion" as to the schedule for developing Cassadaga.  A2483 § 7.6(a). Nevertheless, IRUS had an obligation to exercise that discretion in good faith.  The record showed that it did not.  Its exercise of discretion lacked any rational basis, and the District Court erred by applying hindsight to conclude that IRUS's exercise of discretion was objectively reasonable.

*First*, as a threshold matter, where a contract gives a party "sole discretion," a court must "examine the contract as a whole to determine, based on [the contract's]

language, whether the unfettered exercise of discretion would deprive a party of the fruits of the agreement and render a contractual promise illusory." *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021). Here, although the Merger Agreement gave IRUS sole discretion over the schedule for Cassadaga, the agreement would be illusory if IRUS had unfettered discretion to manipulate the schedule in a manner that deprived Trireme of its earn-out fees.

*Second*, under New York law, an arbitrary action is one that is "without sound basis in reason and is generally taken without regard to the facts." *Heintz v. Brown*, 80 N.Y.2d 998, 1001 (1992) (citation omitted). It is apparent from Court of Appeals and Second Circuit decisions that courts determine whether an act is arbitrary based on the contemporaneous justification for the act and based on the facts considered at the time. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 392 (1995); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 820 (2d Cir. 2014). As in the administrative-law context, the abuse-of-discretion standard is subjective, and courts cannot substitute their judgment after the fact to confirm an otherwise arbitrary action. *See, e.g.*, *Trump-Equitable Fifth Ave. Co. v. Gliedman*, 57 N.Y.2d 588, 592 (1982) (reversing where appellate division confirmed arbitrary agency decision based on appellate division's "independent rationalization").

*Third*, the undisputed evidence at trial showed that, when it made the decision, IRUS management lacked any rational basis for changing Cassadaga's COD to

2021.  The decision was thus arbitrary and irrational and an abuse of discretion.

*Fourth*, in concluding that IRUS did not abuse its discretion, the District Court improperly relied on evidence that IRUS management itself did not consider when making its decision.  The District Court thus applied the wrong standard and erred as a matter of law.

## ARGUMENT

### I.  Standard of Review

"On appeal from a bench trial, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*."  *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 672 (2d Cir. 2015) (quoting *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 67 (2d Cir. 1999)).  "The application of law to undisputed facts is also subject to *de novo* review," *id.* (citing *Deegan v. City of Ithaca*, 444 F.3d 135, 141 (2d Cir. 2006)), "as are mixed questions of law and fact," *id.* (citing *Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77, 82 (2d Cir. 2012)).

### II.  IRUS Had an Obligation to Exercise Its Discretion Under the Merger Agreement in Good Faith

The Merger Agreement gave IRUS "sole discretion" as to the schedule for developing Cassadaga.  A2483 § 7.6(a).  IRUS had an obligation to exercise that discretion in good faith.

"Under New York law, 'implicit in every contract is a covenant of good faith

24

and fair dealing.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Spinelli*, 903 F.3d at 205 (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011)).

"The exercise of an apparently unfettered discretionary contract right breaches the implied obligation of good faith and fair dealing if it frustrates the basic purpose of the agreement and deprives plaintiffs of their rights to its benefits." *Hirsch v. Food Res., Inc.*, 24 A.D.3d 293, 296 (1st Dep't 2005) (citation omitted). A party "cannot automatically relieve itself of the obligation to exercise [a] contractual right in good faith by the simple expedient of adding the language 'sole discretion,' if the failure to act in good faith would render the contract illusory. *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021) (citing *Advanced Water Techs. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 319-21 (S.D.N.Y. 2020)). Rather, where a contract gives a party sole discretion, a court must "examine the contract as a whole to determine, based on [the contract's] language, whether the unfettered exercise of discretion would deprive a party of the fruits of the agreement and render a contractual promise illusory." *Id.* If so, the exercise of "sole" discretion must be undertaken in good faith. *See id.*; *see also, e.g.*, *Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*, 35 A.D.3d 563, 563 (2d Dep't 2006)

25

("[A]lthough certain provisions allowed the plaintiff, in its sole and absolute discretion, to terminate its obligations under the lease, the plaintiff was required to carry out its contractual obligations incident to the exercise of its discretion in good faith.").

*Southern Telecom Inc. v. ThreeSixty Brands Grp., LLC* is instructive. The agreement at issue gave the plaintiff a license to sell products with the "Sharper Image" trademark while giving the defendant sole discretion as to whether to allow the use of the trademark on particular products. 520 F. Supp. 3d at 501. The plaintiff alleged that the defendant breached its duty of good faith and fair dealing in arbitrarily withholding approval to use the trademark in response to the plaintiff's applications to do so. *Id.* at 502.

Based on an exhaustive review of New York law, the court concluded that whether a "sole discretion" clause is subject to the covenant of good faith turns on "(1) whether the covenant would negate the terms of the bargained-for clause; and (2) if not, whether application of the covenant is necessary to preserve the fruits of the contract and prevent it from being illusory." *Id.* at 507 (citing *Moran v. Erk*, 11 N.Y.3d 452 (2008)). The court further explained that "in assessing the application of the implied covenant of good faith and fair dealing, *the context of a contract is critical*." *Id.* at 509 (emphasis added) (citing *Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir 1984) (Scalia, J.)).

Based on the context of the license agreement, the court then held that defendant "was bound by the contract to conduct a good faith application process and to perform a good faith review of [plaintiff's] submissions and retail applications" for permission to use the "Sharper Image" trademark. *Id.* at 510. "To hold that [defendant] could deny applications solely because [plaintiff] STI submitted them would be to deprive STI of the fruits of its contract and render the agreement illusory." *Id.* Consequently, although it had "sole discretion" to decide whether the plaintiff could use the trademark, the court held that the defendant was nevertheless required to exercise its "sole discretion" in good faith. *Id.* at 511.

Here, although the Merger Agreement gave IRUS "sole discretion" as to the schedule for developing Cassadaga, the agreement would be illusory if IRUS's discretion were completely unfettered by its duty to act in good faith.

First, Cassadaga was the most valuable of the Aura projects, and the anticipated earn-out fee of $69.7 million was the most-significant component of the overall consideration for the deal—about $20 million more than the up-front payment and more than 40 percent of the total potential consideration. *Compare* A2453 § 3.1 *with* A2564. When the parties entered into the Merger Agreement, moreover, everyone involved expected that Cassadaga would reach COD by December 31, 2020, and that IRUS would pay the $69.7 million fee. *E.g.*, A3213 ("Development Viability COD <= 2020" of 95%); A3283 ("Probability weighting"

27

of 90%). Indeed, Trireme would not have entered into the deal without a clear path to the Cassadaga earn-out because Cassadaga *on its own* was worth $100 million— twice the up-front payment of $50 million that IRUS paid for the *entire* Aura portfolio. A1295:24-1296:4; A1468:14-16.

Second, the 2016 renewable-energy tax credits were "fundamental" to the business proposition for Project Aura. A1291:22-25; A3144 at 317:3-11; A3154 at 351:5-12. When the parties executed the Merger Agreement, it was mutually understood that IRUS would need to achieve commercial operation of Cassadaga in 2020 to qualify for the 2016 tax credits and that the project would not be economically feasible for IRUS without them. A1291:22-1292:6; A1592:12-18; A1972:11-20.

Consequently, in drafting the "sole discretion" clause, the parties never contemplated that IRUS might be able to complete Cassadaga in 2021 without penalty. Given this context, it is apparent that IRUS's "sole discretion" as to the "details and manner of [commercially reasonable] development efforts and the schedule therefor," A2483 § 7.6(a), could not be employed to purposely or arbitrarily delay the development of Cassadaga and avoid the $69.7 million Milestone Payment. To hold otherwise would deprive Trireme of the fruits of its contract and render the Cassadaga earn-out illusory.

Indeed, the need for IRUS to exercise its discretion in good faith is apparent

from the context of the very provision at issue.  Section 7.6(a) of the Merger Agreement gives IRUS sole discretion over the schedule, but it *also* requires that IRUS use "commercially reasonable efforts" to develop so-called Key Projects, which included Cassadaga.  *Id.*  The entire provision, in other words, is a balancing act that attempts to articulate the parties' intent that (i) IRUS would try to build the Key Projects *but* (ii) Trireme could not dictate the manner in which it did so.  This is precisely the type of agreement that inherently anticipated, and indeed, required that the parties perform in good faith.  Although IRUS had discretion over the schedule, Trireme could reasonably expect that IRUS would proceed in a commercially reasonable way when exercising that discretion.  At a minimum, this required IRUS management to engage in meaningful analysis before making decisions that would potentially impact an earn-out payment.  The agreement did not allow IRUS to act on a whim, or make decisions based only on gut feelings or uninformed intuition.

IRUS thus had "sole discretion"—meaning absolute control—of the development and construction of Cassadaga but *only to the extent that the project otherwise remained on schedule* for a 2020 COD.  Trireme had no right whatever with respect to the details of the Cassadaga schedule.  As long as COD remained in 2020, IRUS could develop and build Cassadaga *however* it wanted. But IRUS could not arbitrarily decide to achieve COD in 2021.  *That* decision was subject to the duty

29

of good faith.

This interpretation enforces the parties' reasonable expectations while giving meaning to the "sole discretion" clause. It does not negate IRUS's bargained-for discretion or render the "sole discretion" clause illusory. It merely limits IRUS's discretion in a manner that harmonizes the provision with IRUS's obligation to use commercially reasonable efforts and with the contract as a whole.

## III. The Record Establishes that IRUS Abused Its Discretion and the District Court Erred in Relying on Hindsight to Conclude Otherwise

Although IRUS had an obligation to exercise discretion over the Cassadaga schedule in good faith, the evidence at trial showed that IRUS acted irrationally and arbitrarily in September 2020 in deciding to delay the COD for Cassadaga into 2021.

### A. The Abuse-of-Discretion Standard

Under New York law, an arbitrary action is one that is "without sound basis in reason and is generally taken without regard to the facts." *Heintz*, 80 N.Y.2d at 1001 (citation omitted); *accord Toledo Fund, LLC v. HSBC Bank USA, Nat. Ass'n*, 2012 WL 2850997, at *6 (S.D.N.Y. July 9, 2012); *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, 2005 WL 352137, at *10 (S.D.N.Y. Feb. 15, 2005). "The term has also been defined as acting in an unreasonable manner—*i.e.*, without 'adequate determining principle, not done or acting in accord[ance] with reason or judgment.'" *Toledo Fund*, 2012 WL 2850997, at *6 (quoting Black's Law Dictionary at 104 (6th ed. 1990). "The term 'irrational' has been defined similarly as 'unreasonable,

30

foolish, illogical, absurd.'" *Id.*

Critically, it is apparent from controlling authority that courts cannot substitute their own judgment when determining whether a party abused its contractual discretion. The *outcome* is irrelevant. What matters for these purposes is the *process*—whether the defendant actually exercised its discretion in a rational manner.

The seminal Court of Appeals case on good faith and fair dealing is directly on point. The plaintiff in *Dalton v. Educational Testing Service* was accused of cheating by the SAT's Board of Review, and the board refused to release the plaintiff's SAT score. 87 N.Y.2d at 391. Pursuant to the parties' agreement, the plaintiff provided information to show that he had not cheated, but the board concluded that he had. *Id.* at 388.

The Supreme Court and the Appellate Division both concluded that the defendant breached its duty of good faith and fair dealing because it failed to consider the information provided by the plaintiff—not because the Educational Testing Service ("ETS") reached the wrong conclusion about whether the plaintiff cheated. *See id.* at 389. Whether the plaintiff cheated was irrelevant to the good-faith analysis. As the Supreme Court explained, "the sole issue before this court for determination is whether or not [defendant] ETS performed its contract with [plaintiff] Brian [Dalton] in good faith. Whether or not [plaintiff] Brian took the

31

SAT on November 2, 1991 [or sent someone else to take it for him] ***does not bear on this ultimate issue*** and will, therefore, not be determined by this Court." *Dalton v. Educ. Testing Serv. of Princeton, N.J.*, 155 Misc. 2d 214, 223–24 (Sup. Ct. Queens Cnty. 1992) (emphasis added), *aff'd*, 87 N.Y.2d 384 (1995).

In affirming, the Court of Appeals noted that "[t]he critical question then is whether the Board of Review ***made any effort to consider this relevant information*** submitted by Dalton." *Dalton*, 87 N.Y.2d at 391 (emphasis added). The question was ***not*** whether, in hindsight, the facts ultimately supported the conclusion reached by the board as to whether the plaintiff cheated or—put differently—whether the board's conclusion was objectively reasonable. *See also African Diaspora Mar. Corp. v. Golden Gate Yacht Club*, 109 A.D.3d 204 (1st Dep't 2013) (reversing dismissal of implied covenant claim arising out of defendant's rejection of plaintiff's America's Cup application because defendant was obligated to perform a "good faith" review of plaintiff's application).

Similarly, this Court found in *Security Plans, Inc. v. CUNA Mutual Insurance Society* that the plaintiff raised a triable issue of fact as to whether the defendant exercised its discretion in an arbitrary manner where a trier of fact could conclude that the defendant had "no valid business reason" for failing to correct a known mistake. 769 F.3d 807, 819-820 (2d Cir. 2014). The Court noted that, despite an awareness of the problem, the defendant "declined to provide the plaintiff with a

revised calculation, *and their reasons for doing so are unclear from the record*." *Id.* (emphasis added). The Court also noted that, on remand, the plaintiff's implied-covenant claim would turn on whether "it *had* a genuine and colorable business justification for its decision." *Id.* (emphasis added). The Court's opinion makes clear that the objective reasonableness of defendant's actions was irrelevant as to abuse of discretion. The operative factual issue was to determine defendant's actual, contemporaneous reasons for its decision.

The district court in *Southern Telecom* also focused on the decision-making process rather than the result. In finding that the plaintiff alleged a breach of the duty of good faith, the court held that the resulting decision "need not be reasonable or correct or even consistent with past standards" but must be "genuine" and "not pretextual." 520 F. Supp. 3d at 511. Put simply, the process must be undertaken in good faith. The result is irrelevant.

The Court of Appeals has expressly articulated this principle in the administrative-law context, providing substantial guidance on how the Court would address the issue in the context of good faith and fair dealing.

Under New York law, a court may overturn the decision of a government agency where the decision "was arbitrary and capricious or an abuse of discretion," among other things. *See* CPLR 7803. In applying that abuse-of-discretion standard, the court's role "is not to determine if the agency action was correct or to substitute

its judgment for that of the agency, but rather to determine if the action taken by the agency was reasonable." *Chem. Specialties Mfrs. Ass'n v. Jorling*, 85 N.Y.2d 382, 396 (1995). Indeed, if the agency's articulated "grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Scherbyn v. Wayne-Finger Lakes Bd. of Co-op. Educ. Servs.*, 77 N.Y.2d 753, 758 (1991) (citing cases); *see N.Y.C. Dep't of Sanitation v. MacDonald*, 215 A.D.2d 324, 324 (1st Dep't 1995) ("Judicial review of administrative determinations is limited to whether the determination is arbitrary and capricious, or an abuse of discretion, and *the court may not substitute its judgment* for that of the agency if the determination is rationally based" (emphasis added)), *aff'd*, 87 N.Y.2d 650 (1996).

For example, in *Trump-Equitable Fifth Ave. Co. v. Gliedman*, the New York City Department of Housing Preservation and Development ("HPD") denied a tax exemption based on its reading of the relevant section of the Real Property Tax Law. 57 N.Y.2d at 592. The trial court vacated the HPD's decision because its interpretation of the relevant statute was arbitrary and capricious, but the Appellate Division upheld the HPD's decision based on its *own* interpretation of statute. *Id.* at 592-93. The Court of Appeals reversed. *Id.* at 593. It held that "in failing to review HPD's denial of the partial tax exemption on the specific ground invoked by the agency and *in substituting its own independent rationalization for upholding the*

34

*agency's determination*, the Appellate Division exceeded the appropriate boundary of judicial review in this area." *Id.* at 594 (emphasis added) (citing cases); *see also, e.g.*, *Figel v. Dwyer*, 75 A.D.3d 802, 805 (3rd Dep't 2010) ("[N]either Supreme Court nor this Court may search the record for a rational basis to support respondent's determination, or substitute its judgment for that of respondent in applying and weighing the enumerated discretionary statutory factors, in the first instance."); *Streety v. Annucci*, 203 A.D.3d 1509, 1515 (3rd Dep't 2022) ("Although the record contains other information . . . that might render the denial of his application rational, a 'court is powerless to sanction the determination by substituting what it deems a more appropriate or proper basis.'" (quoting *Trump-Equitable*, 57 N.Y.2d at 593.)).[5]

## B. IRUS Abused Its Discretion by Changing Cassadaga's COD Without a Rational Basis

For the reasons discussed above, the District Court should have confined its abuse-of-discretion analysis to the evidence of IRUS management's

---

[5] Federal law on abuse of discretion is in accord. The Administrative Procedures Act provides that a reviewing court shall "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," among other things. 5 U.S.C. § 706(2). As the Supreme Court recently reiterated, in applying this standard, "if the grounds propounded by the agency for its decision 'are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

contemporaneous decision-making process. *That* evidence showed that IRUS management acted arbitrarily and irrationally in changing Cassadaga's COD. It was reversible error for the District Court to overlook that evidence and rely, instead, on its own judgment about the project's schedule.

Here is what the legally relevant evidence actually showed: RWE's head of construction John Badeusz testified repeatedly that Cassadaga remained on schedule for 2020 COD after the Covid shutdown and throughout that summer. A2058:10-2059:15; A2152:24-2153:16; A2069:13-20; A2070:6-2071:3; A2112:4-8. His testimony was consistent with contemporaneous documents and testimony of other witnesses. A2831 at 105:3-6; A2885 at 346:16-347:13; A2925 at 507:4-18; A4317; A4901. Indeed, in July 2020, Mr. Baduesz reported to RWE's investor-relations team—meaning, he told the market—that RWE was forecasting a 2020 COD for Cassadaga. A4901.

Mr. Badeusz also testified that the "target COD" was "very meaningful" for a variety of reasons, including earnings, growth targets, and investor relations. A2053:1-14. A potential change of COD was thus a significant decision. Accordingly, Mr. Badeusz testified that, in general, he would expect a *written* cost-benefit analysis of potential impacts after any significant construction delay. A2201:21-2202:16. Similarly, when Mr. Puterbaugh suggested on August 24, 2020, that RWE might need to change the COD for Cassadaga, Mr. Badeusz responded:

"You need to provide **much more detail** on your new estimate of Cassadaga COD than 'sometime in 2021.' . . . The new forecast date would need to be supported with a **great deal more detail**." A4335 (emphasis added). That never happened. Mr. Badeusz never received the information *that he requested*, and the little information he did receive was patently insufficient. According to his uncontradicted trial testimony, Mr. Badeusz:

- did not recall "ever receiving any form of written analysis from Mr. Puterbaugh as to why the COD date should be changed from December 31, 2020, to some other date," A2258:6-9;

- could not identify a single document from Mr. Puterbaugh with "an analysis with a great deal more of detail" about the change, A2261:2-11;

- "did not [himself] prepare an analysis with great deal of detail supporting the change in COD from December 31, 2020," *id.*;

- could not recall anyone who prepared an analysis about the change, *id.*;

- had "no specific recollection of what Mr. Puterbaugh did to make his recommendation to change the COD date," A2259:14-23;

- did not know "who else Mr. Puterbaugh spoke to about changing the COD date," *id.*;

- did not "know what documents [Mr. Puterbaugh] looked at, actually, in coming to that conclusion;" *id.*;

- did not recall any discussion with Mr. Puterbaugh between August 24 and September 1 concerning setting a new COD for Cassadaga, A2257:18-24;

- did not know if he talked to anyone other than Mr. Puterbaugh about moving the scheduled COD to March 5, 2021, A2260:3-10;

37

- had no basis for understanding why COD was changed to March 5, 2021, A2258:10-24; and

- had no recollection of what information was available to him at the time the decision was made to move the COD to March 5, 2021, *id.*

Like Mr. Badeusz, RWE Chief Operating Officer Silvia Ortin-Rios could not give *any* reason for the change in COD for Cassadaga from December 31, 2020, to March 5, 2021, or provide any other information about her role in the process. A2800 at 319:21-320:2; A2800 at 320:3-6, A2800 at 320:23-321:2; A2801 at 324:2-325:1.

In sum, the evidence at trial demonstrated that IRUS management did not undertake any contemporaneous analysis to support its decision to change the COD. Because there were ***no reasons*** given for the change, the decision was made "without sound basis in reason," and because there were ***no facts*** that IRUS considered at the time, the decision was "taken without regard to the facts." *Heintz*, 80 N.Y.2d at 1001. IRUS thus exercised its discretion arbitrarily and irrationally, in violation of the implied covenant of good faith and fair dealing—regardless whether the outcome was objectively reasonable or whether the evidence otherwise sufficiently established a deliberate scheme to avoid paying the Cassadaga earn-out fee.

## C. The District Court Erred by Substituting Its Own Judgment when Evaluating IRUS's Decision to Delay the Cassadaga COD

In its opinion and order, the District Court did not cite any of the evidence discussed in the preceding section. Instead, when analyzing whether IRUS abused

its discretion, the District Court cited evidence about the delays and challenges faced by the Cassadaga project in 2020 and concluded, in hindsight, that it was objectively reasonable for IRUS to delay COD to 2021. The District Court either erred as a matter of law by applying the wrong standard under New York law, *see supra* section III.B, or the Court's analysis of the facts was clearly erroneous because it was not supported by the relevant evidence. Either way, this Court should reverse.

In reciting the applicable law on good faith and fair dealing, the District Court included only one generic sentence about the arbitrary or irrational exercise of discretion. A6105. The court provided no explanation, analysis, or discussion of how the standard is applied. Against that backdrop, the court applied the standard incorrectly.

The District Court concluded that "Plaintiff's suggestion that RWE acted 'without a sound basis in reason and without regard to relevant facts' when it ultimately determined that the COD would likely move to 2021 mischaracterizes the deliberation with which Defendants monitored Cassadaga's progress, considered ways to speed up construction, and eventually decided to adjust their timeline." A6110. Here is how the District Court justified its conclusion:

First, the District Court found that "[t]he evidence shows that, by September 2020, the project, already on a compressed timetable for construction, had suffered delays from COVID-19 and performance issues with [contractor] JBS (including a

39

large crack in the first foundation that it poured, behind schedule)." A6110-6111. The opinion and order contains no citation for this sentence. And the proposition itself is irrelevant because there is no evidence that IRUS management considered these facts in approving the change of COD.[6]

Second, the District Court found that "IRUS weighed a range of acceleration options often used on other construction projects but ultimately concluded that, due to COVID-19 and subsequent supply-chain issues, those options were not available here." A6111. The District Court cited the deposition testimony of Mr. Puterbaugh for this proposition, but none of that testimony was about the decision to delay COD. The testimony was just about the construction of the project. There is no evidence that IRUS management considered any of these facts in approving the change of COD, or that management was even aware of them at the time, and the court cites no such evidence.

Third, the District Court noted, as an example of the prior proposition, that IRUS considered and rejected certain options for accelerating the work of a particular contractor. A6111. Again, the District Court cited Mr. Puterbaugh's

---

[6] In hindsight, the crack in the first foundation was the only reason that Mr. Baduesz could think of to justify delaying COD to 2021, but he did *not* testify that he actually considered that issue when making the decision or that the crack in the first foundation would have been a sufficient justification for changing the COD. A2254:23-2255:21.

testimony, but the testimony was *not* about the factors that IRUS management considered when deciding to delay COD. There is no evidence that IRUS management considered any of these facts in approving the change of COD, or that management was even aware of them at the time, and the court cites no such evidence.

Fourth, the District Court quoted Mr. Badeusz's testimony that "if somebody had a silver bullet to create a solution for all the problems we encountered on that project, I would have bought it." A6111. At best, this quote shows only that Mr. Badeusz would have preferred to complete Cassadaga earlier. This quote is not evidence of the factors that he considered contemporaneously in approving the change of COD to 2021.

The Court then summed up its findings: "Against this backdrop, the decision to push the project's official COD to 2021 was reasoned and deliberate. Plaintiffs cannot attribute arbitrariness to a decision while ignoring the full set of experiences and analysis on which it rested." A6111. But in making this sweeping conclusion, the District Court cites no evidence of the "backdrop" or the "full set of experiences and analysis" actually considered by IRUS management in deciding to change Cassadaga's COD. This is all ipse dixit.

The District Court's analysis thus reveals that it did not rely on the evidence of what IRUS management actually considered in changing Cassadaga's COD to

41

2021.  Rather, the District Court concluded that it was objectively rational, *in hindsight*, to delay Cassadaga's COD.  But the District Court was powerless to affirm IRUS's decision by substituting what it considered a proper basis.  The court applied the wrong standard, and erred as a matter of law, in failing to consider or cite evidence of whether IRUS management itself had a sufficient basis, at the relevant time, for approving the change.  Put differently, the District Court substituted its own independent rationalization for upholding IRUS's decision rather determining whether IRUS abused its discretion.  That was error, and it was not harmless.  IRUS's contemporaneous failure to exercise its discretion in good faith deprived Trireme of a $69.7 million earn-out fee and allowed IRUS to benefit at Trireme's expense.

## CONCLUSION

For these reasons, Trireme respectfully requests that this Court reverse the District Court's judgment, grant judgment to Trireme on its claim for breach of the duty of good faith and fair dealing, and remand the case for further proceedings consistent with the Court's decision.

Dated:  New York, New York
       April 26, 2024

                        BAUGHMAN KROUP BOSSE PLLC

                        By /s/ John F. Baughman_____

                        John F. Baughman
                        Nathaniel E. Marmon
                        One Liberty Plaza – 46th Floor
                        New York, NY 10006
                        (212) 548-3212

                        *Attorneys for Appellants Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A), because it contains 9,881 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ John F. Baughman
John F. Baughman

**SPECIAL APPENDIX**

## **Table of Contents**

**Page**

Opinion and Order of the Honorable Jennifer L. Rochon,
   dated December 14, 2023  .............................................................   SPA1

Judgment of the United States District Court, Southern District of
   New York, entered December 14, 2023, Appealed From  .............   SPA54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRIREME ENERGY HOLDINGS, INC. and
TRIREME ENERGY DEVELOPMENT, LLC,

                              Plaintiffs,

            -against-

INNOGY RENEWABLES US LLC and
INNOGY SE,

                              Defendants.

Case No. 1:20-cv-05015 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

        This case is about the rights and obligations under a merger agreement between

renewable-energy developers regarding the construction of a wind farm in western New York

known as the Cassadaga Project.  Trireme Energy Holdings, Inc. and Trireme Energy

Development, LLC (together, "Plaintiffs" or "Trireme"), formerly the owners of several

renewable-energy projects in the United States, including the Cassadaga Project, bring this

action against their merger-agreement counterparty, Innogy Renewables US LLC ("IRUS")

and its parent company, Innogy SE ("Innogy" and, together, "Defendants").[1]  Although

Trireme has asserted various claims throughout this case, only two remained at the time of the

bench trial before this Court.

        First, Trireme claims that IRUS breached the covenant of good faith and fair dealing

implied in the parties' merger agreement (the "implied-covenant claim") by failing to achieve

---

[1] During this litigation, IRUS was acquired by a German energy company called RWE AG
and subsequently merged into an RWE AG subsidiary called RWE Renewables LLC
("RWE").  The parties do not dispute that RWE adopted IRUS's obligations and liabilities
after the acquisition.  Therefore, unless the distinction is material, the Court will refer to both
RWE and IRUS as "IRUS."

commercial operation of the Cassadaga Project until after December 31, 2020, in order to

escape its obligation to make a $67.9 million milestone payment to Plaintiffs.  ECF No. 43

(the "SAC") ¶¶ 116-129.  Second, Trireme claims that IRUS breached the merger agreement

by failing to timely provide Trireme with certain information regarding the development of

the Cassadaga Project.  *Id.* ¶¶ 153-157.  Trireme also seeks a declaration that Innogy must

honor its guarantee as IRUS's parent company to pay damages under the contract.  *Id.* at 31.

All other claims in this case have been dismissed.

>   The Court held a bench trial on the surviving claims from November 13 to 17, 2023.

Having considered the parties' pretrial and post-trial submissions and the evidence presented

at trial, the Court enters judgment in favor of Defendants, concluding that Plaintiffs have

failed to prove by a preponderance of the evidence that IRUS acted in bad faith to delay

construction of the Cassadaga Project for the purpose of depriving Plaintiffs of the milestone

payment.  The Court also finds no breach of contract as to IRUS's reporting requirements.

Finding no obligation on the part of IRUS, Plaintiffs' request for a declaration regarding

Innogy's guarantee, is denied.

### PROCEDURAL HISTORY

>   Plaintiffs filed their initial complaint on June 30, 2020, asserting claims against

Defendants for breach of contract, tortious interference, and unjust enrichment, as well as

seeking a declaration that Innogy is liable for IRUS's damages under the contract.  ECF No. 1.

On January 13, 2021, Plaintiffs filed the SAC, which is the operative version of the complaint.

The SAC expanded on Plaintiffs' pre-existing claims and added claims for reformation and

breach of the implied covenant of good faith and fair dealing.  *See generally* SAC.

Defendants moved to dismiss Plaintiffs' claims for breach of the implied covenant, unjust

enrichment, reformation, and tortious interference; they did not move to dismiss Plaintiffs'

**SPA3**

breach-of-contract claim.  *See* ECF Nos. 44-45.  On August 17, 2021, this Court granted in

part and denied in part Defendants' motion to dismiss.  *See Trireme Energy Holdings, Inc. v.*

*Innogy Renewables US LLC*, No. 20-cv-05015 (VEC), 2021 WL 3668092, at *1 (S.D.N.Y.

Aug. 17, 2021).  The Court dismissed Plaintiffs' claims for unjust enrichment, reformation,

and tortious interference, but declined to dismiss Plaintiffs' claim for breach of the implied

covenant.  *See id.* at *3-17.

On September 16, 2022, Defendants moved to exclude the testimony of three of

Plaintiffs' expert witnesses and to strike selected testimony from another expert witness's

report.  ECF No. 170.  On September 27, 2022, this case was reassigned to the undersigned.

ECF No. 173.  The Court granted Defendants' motion in part and disallowed a small portion

of the expert testimony, but otherwise permitted the remaining expert testimony to be

presented at trial.  ECF No. 198.

On June 30, 2023, the parties jointly stipulated to the dismissal of Plaintiffs' breach-

of-contract claim alleging that IRUS failed to exercise commercially reasonable efforts to

develop the Cassadaga Project.  ECF No. 212.  Therefore, the only remaining claims to be

tried were Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing,

and a limited breach-of-contract claim asserting that IRUS breached the merger agreement by

failing to comply with certain reporting requirements as to the project's development.

On September 15, 2023, the parties filed their joint pretrial order and each party

submitted proposed findings of fact and conclusions of law.  *See* ECF Nos. 224-26.  The

Court conducted a final pretrial conference on November 7, 2023.  The Court held a bench

trial from November 13 to November 17, 2023, during which it received live testimony from

seven witnesses, testimony through deposition designations from six other witnesses (some

3

via video), and hundreds of exhibits.[2]  On November 28, 2023, the parties updated their

proposed findings of fact and conclusions of law.  *See* ECF Nos. 253-54.  The Court heard

closing statements and oral argument on November 29, 2023.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the

following findings of fact and conclusions of law.

**FINDINGS OF FACT[3]**

**I.    The Parties and Relevant Non-Parties**

In 2009, Trireme Energy Development, LLC acquired EverPower Wind Holdings, Inc.

("EverPower"), a renewable-energy company that developed, owned, and operated wind

farms throughout the United States.  Tr. at 88:21-89:5.  Through Trireme Energy Holdings,

Inc., a British private-equity firm called Terra Firma Capital Partners Fund Three, LLP

("Terra Firma") owns about 95 percent of the Trireme entities; James Spencer, EverPower's

founder and Trireme's CEO, owns the remaining 5 percent.  *See id.* at 89:18-25, 156:10-11.

Trireme operated each of its projects through a different special-purpose entity; the project at

issue in this case was developed through a special-purpose entity known as Cassadaga Wind

LLC.  *See* PX 152.

In December 2017, Trireme sold EverPower's assets.  Its six wind farms already in

operation were sold to BlackRock, Inc., while IRUS purchased EverPower's portfolio of

projects in development.  Tr. at 99:14-17, 293:9-21.  At the time, IRUS was the U.S.

subsidiary of Innogy, a German energy company.  *See* PX 27 ("Young Dep.") at 28:9-19.

---

[2] Citations to "PX" refer to a plaintiff exhibit; "DX" to a defendant exhibit; "Tr." to the trial transcript; and "Dep." to deposition designations of the person indicated.  Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

[3] The Court's findings of fact are primarily contained in this section but appear as well in its conclusions of law.

Later, on July 1, 2020, a German utility company, RWE AG, acquired IRUS, which was eventually merged into a subsidiary of RWE Renewables Americas, itself a subsidiary of RWE AG. *See* Tr. at 249:21-250:2; PX 310.

## II. The Merger Agreement

On December 17, 2017, Trireme and IRUS entered into an agreement under which IRUS acquired from Plaintiffs a portfolio of approximately 40 renewable-energy projects in development. *See* PX 1 (the "Merger Agreement" or "Agreement"); Tr. at 105:15. Among the most valuable of the projects under development was the Cassadaga Project, a proposed 125-megawatt wind farm, consisting of 37 wind turbines, in Chautauqua County, New York. *See* Tr. at 106:14, 686:7-8, 856:3.

In exchange for the renewable-energy portfolio, IRUS agreed to pay Trireme $50 million upfront, plus an additional payment "in an aggregate amount of up to $112,200,000, if any," which was conditioned on various milestones associated with the development and construction of the projects (the "Milestone Payment"). Agreement § 3.1. The potential Milestone Payment associated with the Cassadaga Project was $69.7 million. *Id.* § Annex 1.

The Merger Agreement reflects the following regarding milestones for the Cassadaga Project:

> "Payment Milestone" means . . . with respect to the Cassadaga Project, either (x) prior to October 1, 2019, either (1) the occurrence of the events listed in Section C(1) of Annex 1 or (2) the Cassadaga Project has obtained a valid, enforceable interconnection agreement and construction agreement and a full notice to proceed under such construction contract has been issued for construction of the Cassadaga Project or (y) the Cassadaga Project shall have reached its Commercial Operation Date on or before December 31, 2020.

*Id.* § 1.1. In sum, the Merger Agreement provided that IRUS would pay an additional $69.7 million to Trireme if the Cassadaga Project had: (1) by October 1, 2019, among other things,

received an enumerated list of permits and approvals necessary to begin construction (the "October Milestone"); or (2) reached its "Commercial Operation Date" (the "COD") by December 31, 2020 (the "December Milestone").  *Id.*  The October Milestone is not at issue in this case.

With respect to the December Milestone, the Merger Agreement defined the COD as the date on which a project is "mechanically complete," "interconnected to the transmission grid," and, among other things, "has commenced selling commercial quantities of power."  *Id.* In other words, IRUS would owe Plaintiffs $69.7 million under the Merger Agreement's December Milestone if it completed construction and began to operate the Cassadaga Project on or before December 31, 2020.

Section 7.6(a) of the Merger Agreement further provides that IRUS "shall use commercially reasonable efforts . . . to continue to develop the Key Projects [including the Cassadaga Project] in accordance with the applicable standards of care set forth on Annex 2." *Id.* § 7.6(a).  Annex 2, in turn, lists four goals that IRUS was required to use "commercially reasonable efforts" to seek to achieve.  Each of those goals relates to pre-construction matters addressed at the development stage, such as maintaining the project's land rights and its existing power-purchase agreements (under which the project would sell the electricity that it generated), and continuing with the process to acquire the permits necessary to begin construction.  *Id.* § Annex 2.  Even with respect to these goals, Section 7.6(a) adds that "the details and manner of such development efforts and the schedule therefor shall be within the sole discretion of [IRUS]."  *Id.* § 7.6(a).  If IRUS "determine[d] to cease development of and abandon" a "Key Project" (such as the Cassadaga Project) before October 1, 2019, it needed only to provide notice to Plaintiffs of its intent to do so, after which it would "have no further obligation with respect to development" of that project.  *Id.*

The Merger Agreement also requires IRUS to "keep [Plaintiffs] informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the development of [the Cassadaga Project], by delivering information" in an agreed-upon form to James Spencer, Plaintiffs' designated representative. *Id.* § 7.6(b).  In the same section, the Merger Agreement adds that "Purchaser shall also reasonably cooperate with [Spencer] to respond to [Spencer's] reasonable ad-hoc inquiries regarding the development of [the Cassadaga Project]; provided however, [Spencer] shall limit such inquiries to a reasonable level, taking into account the stage of development of the applicable Key Project." *Id.*

Also relevant in the Merger Agreement is a choice-of-law provision, which provides that "any claim or controversy directly or indirectly based upon or arising out of this Agreement . . . , including all matters of construction, validity and performance, shall be governed by and interpreted and enforced in accordance with the laws of the State of New York." *Id.* § 13.5.

Finally, the Merger Agreement contains an integration clause, which states that the agreement "set[s] forth the entire understanding of the Parties hereto with respect to the transactions contemplated hereby" and "supersede[s]" "[a]ny and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral." *Id.* § 13.9.

On December 21, 2017, Innogy and Trireme entered into a parent guarantee under which Innogy "irrevocably and unconditionally guarantees . . . the payment when due of [IRUS's] payment obligations arising under the [Merger Agreement]."  PX 4 (the "Parent Guarantee" or "Guarantee") § 2.1.

### III.    Overview of Relevant Tax Credits

To encourage investment in the development of renewable energy, Congress has issued tax credits to qualifying wind-energy projects.  Tr. at 393:11-22.  At the time of the Merger Agreement, the Internal Revenue Service (the "IRS") provided two types of tax credits to qualifying wind-energy projects: Production Tax Credits ("PTCs") and Investment Tax Credits ("ITCs").  *Id.* at 393:23-394:6.  The PTCs available for a given project are determined by the electricity produced from the facility, while ITCs are calculated as a percentage of a project's qualifying capital expenditures.  *Id.*

For a project to obtain the credits, the IRS requires that continuous efforts be undertaken to build and develop each facility, but provides a safe harbor such that if the project is completed within a specified period, it is deemed to have met the continuity requirement.  *Id.* at 397:7-25.  Under then-operative IRS guidance, a project was deemed to begin undertaking such efforts in the first year in which the project spent at least five percent of its final qualifying costs, such as by purchasing turbines and other equipment.  *Id.* at 396:2-15.  Placing a facility into service within four calendar years after construction began would bring the project within the safe harbor.  *Id.* at 397:20-25.  For example, a $100 million wind farm would qualify for the 2016 tax-credit safe harbor if the owner purchased at least $5 million of wind turbines in 2016 and placed those turbines into service at the wind farm no later than December 31, 2020.  If the project achieved COD after December 31, 2020, the project would not fall within the IRS's safe harbor.  *Id.* at 398:6-11.  The developer could still receive the full value of the applicable tax credits, but it would need to demonstrate to the IRS that it had undertaken continuous efforts to place the project into service, rather than rely on the "cut-and-dried" safe harbor.  *Id.* at 763:13-20, 764:12-20.  The developer could also apply for tax credits on a turbine-by-turbine basis.  *Id.* at 428:4-21. For projects that began

8

construction in 2017 or later, the original amount of available renewable-energy tax credits

decreased by 20% for each year after 2016 that the project began construction, until the tax

credits were phased out.  *Id.* at 430:25-431:1-10.

## IV.   The Parties Tie the December Milestone to a Specific Date Rather than Receipt of Tax Benefits

At the time that the Merger Agreement was executed, the parties understood that IRUS

would receive a financial benefit in the form of tax credits if the Cassadaga Project were to

achieve COD by December 31, 2020.  *See id.* at 129:8-9, 262:13-19; Young Dep. at 222:8-12,

351:5-13.  Internally, Trireme confirmed that the potential tax credits should create a financial

incentive for IRUS to complete a project in 2020, even if it had to pay a corresponding

milestone payment.  *See* PX 545.  These calculations helped assure Trireme that IRUS

"wouldn't stall and build the pipeline" of projects in development so they "don't have to pay

[the] earn-out[s]."  *Id.* at 1.  In the executed agreement, however, the December Milestone was

not linked to IRUS's receipt of tax credits; rather, it was triggered only if the Cassadaga

Project reached COD by December 31, 2020.  *See* Agreement § 1.1, at 11.

During negotiations about the Merger Agreement, Trireme executives debated among

themselves (and with their advisors) about the expiration date for the Milestone Payment.

*See, e.g.*, DX 13; DX 67.  Trireme's CEO, Spencer, did not want an expiration date associated

with the Milestone Payment.  *See* DX 67; Tr. at 181:4-15.  Trireme also considered asking for

a Milestone Payment formula that still provided Trireme with a percentage of the Milestone

Payment in case the Cassadaga Project reached COD after 2020, prorated by the percentage of

tax credits available for that year during which the project eventually reached COD.  DX 13

at 2.  However, Barclays – the investment bank hired to advise Plaintiffs on the Merger

Agreement – disagreed and recommended including a specific December 31, 2020 COD as

the milestone trigger.  *See id.* at 1; Tr. at 310:11-313:9.  Ross Brinklow, a principal at Terra

Firma, accepted Barclays's recommendation, and the Merger Agreement ultimately provided

for a December Milestone based on COD by December 31, 2020, untethered to the receipt of

tax credits.  Tr. at 312:18-25; Agreement § 1.1; *Trireme*, 2021 WL 3668092, at *13-15

(dismissing Plaintiffs' reformation claim that the parties understood the December Milestone

to serve as a proxy for the expiration of the tax credits).

In any event, IRUS was motivated by more than the potential tax credits to achieve

COD of the Cassadaga Project by December 31, 2020.  The longer that IRUS took to place a

project into service, the longer it would forego revenue to recoup its investment.  Establishing

an on-shore wind energy presence in the United States was also a strategic goal for Innogy.

*See* Young Dep. at 36:19-37:25; Tr. at 678:12-679:7.  The Cassadaga Project was to be one of

Innogy's first wind farms in the United States, and much of the company's earnings and

growth goals hinged on completing projects like Cassadaga in 2020.  *See* PX 17 ("Falkenhof

Dep.") at 51:14-52:7; Tr. at 678:12-679:7.  In its annual report, Innogy represented to its

shareholders publicly that it intended to achieve a "generation capacity of around 500

[megawatts]" in the United States by 2020.  DX 33 at 45; *see* Tr. 678:23-679:7, 692:8-19.

IRUS's bid for Plaintiffs' portfolio of projects reflected an aggressive strategy to establish a

presence in the United States's renewable-energy market by 2020; its offer of an upfront

payment of $50 million exceeded the next-highest offer of guaranteed compensation, from

BlackRock, by $20 million.  Tr. at 297:16-19, 306:8-12.

**V.    Pre-Closing Transition of the Cassadaga Project**

Although the parties executed the Merger Agreement on December 21, 2017, the deal

did not close – that is, IRUS did not take over management of development and construction

of the Cassadaga Project – until July 26, 2018.  Tr. at 186:23-187:1.  This gap was largely due

to the need for regulatory approval before IRUS could legally acquire Cassadaga Wind LLC: first, from the Committee on Foreign Investment in the United States, and second, from the New York Public Service Commission. *Id.* at 706:11-707:13.

At the outset, the parties initially expected that the Cassadaga Project would reach COD in September 2019, well before the December 31, 2020 date included in the Merger Agreement. PX 72 at 5. However, on March 1, 2018, after the Merger Agreement was executed, the New York Independent System Operator ("NYISO") issued its 2017 Class Year Facilities Study for the project, in which National Grid – the power grid operator – determined when IRUS could connect the project to the grid and how much that connection would cost. Tr. at 717:8-13; *see* DX 272. Its study indicated that National Grid would not permit the Cassadaga Project to connect into the grid until, at the earliest, October 2020. DX 272 at 25-26. National Grid also listed December 2020 as the anticipated start of the project's commercial operations. *See id.* This update forced the parties to revise their original expectations of a 2019 COD for the Cassadaga Project. Tr. at 720:23-721:2; *see* DX 38. Whereas the parties previously had a "time buffer" of 15 months to build the Cassadaga Project before the end of 2020, NYISO's new Facility Study shortened that window to three months. PX 72 at 5, 17. Having learned from National Grid's study that building the Cassadaga Project would take longer and could cost much more than expected, IRUS in April 2018 began to engage in financial modeling to explore the different scenarios available for the project. *See id.* at 14; DX 272 at 23, 26; Tr. at 717:24-721:2, 722:4-723:7.

IRUS nevertheless prepared to work with Plaintiffs to ensure that the project would be on track for a COD before December 31, 2020, when it assumed operational control in July 2018. As IRUS's then-CEO testified:

> In the bridging period, [IRUS] definitely tried to advance the
> development projects, including Cassadaga, as much as it could
> in collaboration with the EverPower staff. . . . [W]e really
> wanted to see the project succeed and advance as quickly as
> possible so that it could be commissioned and constructed as
> planned, and . . . we assigned significant resources to support
> that effort and help drive it forward and make key decisions and
> continue its development.

Young Dep. at 117:7-20.

        However, between the Merger Agreement's execution and its closing, Plaintiffs took

several steps that frustrated IRUS's efforts to further the project's timely development.  First,

Plaintiffs restricted IRUS's communications with Trireme employees.  In an email sent on

April 23, 2018, Brinklow of Terra Firma directed IRUS to communicate with Plaintiffs

through only a single Trireme employee.  PX 65 at 5.  Centralizing communications in this

way "really put a wrench in the gear box of being able to advance the development of

projects, especially . . . Cassadaga."  Young Dep. at 123:19-22.  Brinklow also forbade IRUS

from "shar[ing] project data with third parties," including contractors that IRUS planned to

hire to construct the Cassadaga Project.  PX 65 at 5.  This measure "slowed things down"

because "[t]here just wasn't the ability to finalize key aspects of the project design

collaboratively with turbine selection, site arrangement, and launch key permits that typically

take a long time to secure before you can actually start physical work on the project site."

Young Dep. at 122:15-23.  Brinklow ordered these steps because he began to doubt that the

Merger Agreement would close and did not want to share information if it was not going to

close.  Tr. at 282:17-25.  In response, IRUS explained that these restrictions would not "serve

to our common goal in advancing the progress of the projects" but reluctantly agreed to follow

them.  PX 65 at 4.

Second, Plaintiffs had not yet applied for a wetlands permit from the U.S. Army Corps

of Engineers by the time that IRUS took over the Cassadaga Project on July 26, 2018.  *See*

Young Dep. at 148:1-14.  Approval of such an application usually takes about a year.  *Id.*

at 148:23-149:13.  The wetlands permit "was an essential permit."  *Id.* at 147:14-15.  Critical

parts of the project, such as the switchyard by which the project would deliver electricity to

the New York State power grid, were located on a wetland.  PX 19 ("Puterbaugh Dep.")

at 50:10-16.  While most of the Cassadaga Project site was not itself a wetland, construction

crews could not access the non-wetland portions of the site without crossing wetlands via

access roads.  Tr. at 754:15-24; PX 26 ("Walton Dep.") at 17:19-18:9.  Therefore, without the

wetlands permit, IRUS could not use those access roads to reach most of the Cassadaga

Project site.  Puterbaugh Dep. at 50:17-51:11; Walton Dep. at 263:15-19.  Until the Army

Corps of Engineers approved this permit, construction could proceed only in piecemeal

fashion, an approach that IRUS and its contractors confirmed was not economically feasible.

Walton Dep. at 263:15-19.

## VI.     Pre-Construction Development Efforts

### A.  Scheduling Setbacks

Based on the foregoing challenges, IRUS already faced scheduling setbacks when it

ultimately closed the deal and took over the Cassadaga Project on July 26, 2018.  To help

expedite the project, IRUS filed the application for the wetlands permit on August 3, 2018,

within a few days of the Merger Agreement's closing.  Young Dep. at 147:16-25; DX 50

at 10.  IRUS did not receive the Army Corps of Engineers permit until December 19, 2019.

*See* PX 176 at 3.  The late permit meant that construction could not start until the winter

months, which introduced more uncertainty and additional work.  In western New York,

where the Cassadaga Project site is located, snow, below-freezing temperatures, and shorter

13

daylight hours slowed the pace of construction work.  Puterbaugh Dep. at 60:22-61:20; Walton Dep. at 19:10-11.

Other issues beyond IRUS's control further delayed the development – and, eventually, the construction – of the Cassadaga Project.  Within two months of IRUS taking over the Cassadaga Project, five IRUS employees, who had previously worked for Plaintiffs on the project's development, resigned.  Young Dep. at 153:2-9.  Among that group were two key employees who were responsible for the project's development under Plaintiffs.  Tr. at 195:10-17.  This "mass departure" of employees with deep institutional knowledge of the project "made it a lot more challenging" to keep the project's development on schedule because IRUS "had to pick up a lot of pieces" and "scramble quickly to hire people that would be able to pick up threads."  Young Dep. at 152:2-9.  Brinklow conceded at trial that the departure of these employees was a "negative event . . . in connection with the development of the Cassadaga Project."  Tr. at 334:23-335:2.

Plaintiffs had also failed to secure approval for the project's point of interconnection, that is, the site at which a substation would transfer power generated by the Cassadaga Project to the larger power grid (the "POI location").  In November 2017, prior to executing the Merger Agreement, Plaintiffs learned that National Grid had disapproved of their proposed POI location.  DX 15.  Plaintiffs began considering alternate locations, *id.*, but ultimately disputed National Grid's decision and tried to convince the operator to permit the original location, Tr. at 190:6-20.  In November 2018, after IRUS took over the project, IRUS learned that National Grid would not sign off on the location that Plaintiffs had chosen.  DX 122 at 1.  To confirm a new POI location with a redesigned substation that National Grid would accept, IRUS needed to amend – and seek approval of – the state permit required for the project's construction (the "Article 10 permit").  Young Dep. at 161:16-22; *see* PX 105A.

14

**B. Innogy Makes "Final Investment Decision" on the Cassadaga Project**

On May 21, 2019, as development on the Cassadaga Project concluded, IRUS presented the project to the board of its parent company, Innogy SE, for a "Final Investment Decision," or "FID," on whether Innogy would commit the capital necessary to see the project through construction to completion.  Tr. at 752:9-20; PX 130.  At this meeting, the board considered whether to invest in the project now, delay its investment, sell the project, or abandon it entirely.  PX 130 at 15.

In its presentation to the board, IRUS suggested that investing in the project now, to enable a 2020 COD, remained the "most attractive option[]."  *Id.*  IRUS added that, with a 2020 COD, the Cassadaga Project would "be a main contributor to our overall onshore target to install 350-500 [megawatts] of wind energy capacity in the US by the end of 2020."  DX 82 at 2.

However, IRUS qualified its recommendation with some uncertainty that the Cassadaga Project would reach a 2020 COD.  Although IRUS expected to begin construction in the third quarter of 2019 and achieve COD in the fourth quarter of 2020, it also identified "schedule delays" in obtaining an amended Article 10 permit and the wetlands permit.  *Id.* at 4.  IRUS explained that "[i]f both permits are not obtained, achieving a 2020 COD is unlikely."  *Id.*  IRUS also "stressed that a timely COD appear[ed] to be very uncertain given the numerous risks (e.g. permit, construction phase) and the tight timetable."  PX 126A at 1.

Notwithstanding the risks, the Innogy board ultimately accepted IRUS's recommendation and approved a Final Investment Decision for the Cassadaga Project with a target date of COD by Q4 2020.  Tr. at 757:17-22; DX 82 at 4.

15

### C.  Trireme Also Notes Uncertainty for a 2020 COD

On July 29, 2019, IRUS informed Trireme that it had "decided internally to keep advancing the project," and that, "[i]n furtherance of that approach, [it had] made the necessary commitments and major payments . . . to support a 2020 COD."  PX 142 at 1.  IRUS stressed, however, there were "still several hurdles and some outstanding permits and development items to secure to assure we can achieve the 2020 COD."  *Id.*  In the same email, IRUS communicated that it had decided to delay the COD for another project to 2021 due in part to similar permitting challenges.  *Id.*

Plaintiffs absorbed this information, noting internally the uncertainty of achieving COD in 2020.  For example, in December 2019 – shortly before IRUS received a wetlands permit from the Army Corps of Engineers – Terra Firma's internal estimates projected only a 60% chance that Cassadaga would achieve COD in 2020.  *See* DX 125 at 3; Tr. at 339:18-340:22.

### VII.    Initial Construction of the Cassadaga Wind Farm

On December 19, 2019, IRUS obtained the wetlands permit for the Cassadaga Project from the Army Corps of Engineers – a "huge milestone" that allowed the project to proceed with construction.  PX 176 at 3.  With the permit in hand, IRUS immediately scheduled its contractors to begin construction the next week, between Christmas and New Year's Eve – a week during which construction contractors usually do not work due to the holidays and the cold weather.  Puterbaugh Dep. at 51:18-52:3; Walton Dep. at 20:17-24.  IRUS hired several contractors to help construct the Cassadaga Project.  Tr. at 1023:3-6; *see* Walton Dep. at 13:19-25.  Among the most significant of those contractors were: (1) The O'Connell Electric Company ("O'Connell Electric"), which IRUS hired to build the POI substation that would deliver electricity to the power grid, Puterbaugh Dep. at 39:15-24; 60:10-13; (2) JBS

Energy Solutions ("JBS"), hired as the civil works contractor to prepare the project site, build

access roads to the site, and pour the concrete foundations for the wind turbines, *id.*

at 74:23-75:3; (3) Global Wind Services, hired to erect and install the wind turbines, Tr.

at 1113:7-11; and (4) Siemens Gamesa Renewable Energy S.A. ("Siemens Gamesa") and

Nordex SE, hired to supply the actual wind turbines, Puterbaugh Dep. at 128:2-6.

Given the pre-construction delays – including the delay in obtaining the wetlands

permit – which prevented IRUS from starting construction until late December 2019,

O'Connell presented IRUS with a mitigation plan in late January 2020 to accelerate its work.

*Id.* at 63:8-13; PX 188.  Because construction had started in late December 2019 instead of, as

anticipated, October 2019, IRUS did not think that it could place the Cassadaga Project in

service by the end of 2020 without this mitigation plan.  Puterbaugh Dep. at 62:10-18.  As

part of that plan, O'Connell requested, and IRUS approved, a change order that included

working overtime and additional shifts through the winter months.  *See id.* at 313:12-315:15;

PX 188.  IRUS paid O'Connell an additional $534,594 under that change order.  *See* PX 188

at 2; PX 196; Walton Dep. at 19:4-15.

**VIII.   COVID-19 Pauses Construction**

    **A.  New York's Initial Shutdown**

Then the COVID-19 pandemic hit. On March 22, 2020, the State of New York

directed all non-essential businesses to shut down in-person functions due to the COVID-19

pandemic.  *See* PX 25 ("Sundstrom Dep.") at 57:8-58:20.  Initially, IRUS understood the

state's order to allow utility-related construction and continued work on the project.  Walton

Dep. at 21:7-18, 24:8-20, 25:12-21; PX 256A at 4.  In the beginning of April 2020, however,

IRUS learned that the Cassadaga Project was not exempt from New York's shutdown.

Walton Dep. at 26:6-24.  Therefore, work was paused on the Cassadaga construction site on

April 7, 2020.  *Id.* at 26:2-17; PX 237; Puterbaugh Dep. at 73:8-16, 211:4-23.  IRUS quickly

petitioned state regulators to continue construction on the project.  *See* Sundstrom Dep. at

28:15-29:2.  IRUS also hired a law firm, which applied for and received a partial exemption

from the state's construction restrictions to continue work on the POI switchyard and

meteorological towers as essential work.  DX 142 at 3; PX 243; Puterbaugh Dep. at 70:8-

71:18, 85:2-23.  Of the project's 165 workers, only 20 were allowed to continue the project's

"high-voltage" work, including on the POI substation.  Walton Dep. at 22:7-13; *see id.* at

27:10-17; PX 237; PX237A.  The other 145 workers were barred from the project site for the

duration of New York's shutdown, which lasted from April 7 to May 19, 2020.  *See* Tr. at

577:14-21; Walton Dep. at 30:6-10; Puterbaugh Dep. at 69:14-70:3.

On May 19, 2020, the same day that IRUS received notice that western New York was

reopening from the COVID-19 shutdown, Jeffrey Puterbaugh, IRUS's senior director of

construction, wrote to O'Connell Electric that construction could resume on the Cassadaga

Project.  DX 153.  However, workers were not able to remobilize to the Cassadaga Project in

earnest until June 8, 2020.  *See* Tr. at 580:22-25.  For a project as large and complex as

Cassadaga, remobilization required more than switching on the lights.  Walton Dep.

at 22:20-23:9.  Not knowing how long the shutdown would last, IRUS's contractors had

moved their equipment off the site.  *Id.* at 23:1-9.  To bring that equipment back, the

contractors needed new permits.  *Id.*  Another contractor informed IRUS that "[i]nefficiencies

due to COVID-19 impacts and State ordered additional safety measures" had further delayed

its remobilization by two weeks.  *See* PX 292A at 2.  IRUS expected remobilization to take

between one and two weeks.  Walton Dep. at 23:8-9; *see* PX 492A at 2.  Ultimately, workers

did not fully remobilize to the project site until about eight weeks after the shutdown on

April 7, 2020.  *See* Walton Dep. at 232:8-21.

### B.  COVID-19 Challenges Persist

Even after New York lifted its shutdown order, COVID-19 introduced additional delays into IRUS's construction schedule.  New York imposed travel restrictions, contact tracing, and quarantine requirements, which adversely impacted the Cassadaga Project.  Tr. at 896:14-897:10, 897:18-898:10.  In particular, at least three workers at the Cassadaga site tested positive for COVID-19 during construction.  Each positive test required contact tracing and further testing on the site before work could resume, creating additional days of delay each time.  PX 444; *see* Puterbaugh Dep. at 116:10-17.

Several contractors also imposed restrictive protocols in response to COVID-19, limiting IRUS's ability to accelerate its construction timeline.  O'Connell Electric required a two-week quarantine for any employee exposed to someone with COVID-19.  DX 141 at 8. For employees with COVID-19 symptoms and employees in contact with confirmed or suspected COVID-19 cases, Siemens Gamesa issued a 15-day ban from its premises.  *Id.* at 53-54.  One subcontractor, Signal Energy Constructors, restricted "[a]nyone who uses mass transit travel" from working in its office or on site for two weeks, applying its policy even for employees with no symptoms and no contact with anyone diagnosed with COVID-19.  *Id.* at 10.  Another subcontractor, Capital City Renewables, required its crew members to be picked up by car and driven to sites.  *Id.* at 9.  These COVID-19 protocols further slowed the Cassadaga Project's progress by restricting access to the construction site and imposing additional requirements.

### C.  COVID-19 Forces Parties to Manage Expectations for a 2020 COD

The onset of the pandemic prompted the parties to revisit once again their expectations for the Cassadaga Project's COD.  In IRUS's view, while a 2020 COD was becoming less likely, it was still possible and remained the goal.  *See* Walton Dep. at 143:13-20, 228:3-10.

19

In April 2020, IRUS sent Innogy a "Cassadaga Covid-19 Work Suspension Risk Assessment"
with various scenario plans, PX 260, including one that that predicted that if work resumed
around mid-June – as ultimately happened – the "[o]riginal schedule [would be] impossible,"
PX 260A.  That risk assessment allowed a "very small chance [that] acceleration plans could
recover for 2020 COD."  *Id.*  But IRUS's goal was still to press for a COD in 2020.  *See*
Walton Dep. at 24:14-18.  Amid "a lot of uncertainty, . . . the belief [was] that the project
could still be COD'd in 2020."  *Id.* at 32:13-24.

Plaintiffs also understood that the COVID-19 pandemic would delay completion of the
project.  An IRUS employee informed Plaintiffs on April 2, 2020, that the project was "on
track for a Q4 2020 COD" but cautioned that "the rapidly evolving COVID-19 situation in
New York may result in a temporary shutdown of our construction activities at Cassadaga.
This is a dynamic situation."  PX 234 at 1.  Terra Firma employees were pessimistic in early
April 2020 about the project's likelihood of reaching a 2020 COD.  In an email sent on April
9, 2020, Brinklow estimated that COVID-19 had reduced the likelihood of a 2020 COD and a
corresponding Milestone Payment to 30%.  *See* DX 144 at 1.  An internal Terra Firma
presentation from mid-April 2020 – citing 195,000 COVID-19 cases in New York as of April
14, 2020, social-distancing measures, and working restrictions – similarly lowered the
project's probability of achieving the December Milestone from 60% to 30%.  *Compare* DX
125 at 3, *with* PX 247 at 5; *see* PX 247 at 6.  Shortly thereafter, an updated version of the
same presentation – noting over 250,000 COVID-19 cases in New York, "the worst affected
area of the United States," as of April 20, 2020 – lowered this probability to 0%, adding that
"[i]t is not clear that construction work on the project could continue in the same manner and
at the same pace given social distancing measures and working restrictions."  DX 259 at 3; Tr.
at 349:5-350:5.

IX.    **IRS Extends the Safe-Harbor Deadline**

Because the COVID-19 pandemic disrupted construction across the country, the American Wind Energy Association ("AWEA"), a wind-power trade group of which IRUS was a dues-paying member, lobbied Congress on behalf of the industry to extend the safe-harbor deadline for wind-energy projects to obtain the full value of renewable-energy tax credits.  *See* Sundstrom Dep. at 20:25-21:15, 161:6-17, 171:24-172:18.  As an industry trade group, AWEA represented most, if not all, major wind-power companies in the United States in their dealings with federal and state governments.  *Id.* at 18:9-19:5.

In May 2020, the IRS announced that it would extend the safe harbor for renewable-energy projects that began construction in 2016 and 2017.  DX 158.  Noting that "COVID-19 has caused industry-wide delays in the supply chain for components needed to complete renewable energy projects otherwise eligible for important tax credits," the IRS added an extra year by which these projects could be placed in service for their construction to be deemed continuous.  *Id.*  Under the new guidance, IRUS could therefore obtain the full value of the relevant tax credits for the Cassadaga Project if it achieved commercial operation before December 31, 2021.

IRUS employees welcomed the safe-harbor extension announcement.  On May 7, 2020, IRUS's director of governmental and regulatory affairs Craig Sundstrom emailed several IRUS executives, including then-CEO Frank Falkenhof, that "US Treasury just announced . . . that the[] agency will be issuing rules to extend the wind PTC and ITC safe harbor by one year. . . . [T]his is a huge development for us and in line with our recent advocacy."  PX 274 at 1.  In another email sent that day to IRUS's regulatory lawyers, Sundstrom called the announcement "very good news for Cassadaga."  PX 275 at 1.  The safe-harbor extension became official on May 28, 2020.  *See* I.R.S. Notice 2020-41, 2020-25

21

I.R.B. 954.  IRUS finance director Juan Rodriguez forwarded a copy of the official IRS notice to several colleagues, commenting: "I am happy to share the attached IRS / Treasury notice with you.  It is the anticipated guidance we were eagerly seeking to provide relief due to Covid-19 delays."  PX 284 at 1.

While the correspondence in the record reflects relief over the extended availability of a valuable tax credit, there is no evidence that IRUS thereafter paused, delayed, or stopped working on the Cassadaga Project or even that they ever discussed doing so because the safe harbor had been extended.  Jade Walton – IRUS's and RWE's project manager for Cassadaga – testified that, after the safe-harbor extension, "[t]he message from my boss and my boss's boss was to always – to bring in the project in 2020, and that was the goal, and that was the objective."  Walton Dep. at 36:17-21; *see also id.* at 262:12-15.  Puterbaugh, who oversaw IRUS's construction projects, similarly denied that there were any "instructions or direction from management to slow down the work on Cassadaga," stating that, "on the contrary, we were being pushed very hard to accelerate the work if we could and get it done as quickly as possible."  Puterbaugh Dep. at 156:6-21.  Other members of IRUS's management team, including Falkenhof and Rodriguez, also credibly denied that there was any attempt by IRUS to purposely delay the Cassadaga Project's construction to 2021 or to deprive Trireme of its Milestone Payment.  *See, e.g.*, Sundstrom Dep. at 67:23-68:16; Falkenhof Dep. at 148:3-10; Tr. at 773:12-774:10 (Rodriguez).  On the contrary, those at IRUS involved in managing and supervising the Cassadaga Project pressed on with their goal of completing the project in 2020.  *See, e.g.*, Walton Dep. at 238:19-239:15.  The Court finds this testimony credible and consistent with IRUS's continued actions to complete construction before December 31, 2020, even after the safe-harbor extension was granted.

### X.    Post-Extension Construction Efforts

#### A.    IRUS Keeps Projected COD of 2020

Even after the IRS's safe-harbor extension, IRUS still believed that it was possible to operationalize the Cassadaga Project in 2020 and continued to push to complete the project within that time.  *See id.* at 32:13-24.  On the same day that New York ended its shutdown, May 19, 2020, and announced a "Phase I Reopening" in the county where Cassadaga was located, IRUS notified O'Connell Electric that construction could and should resume immediately.  *Id.* at 29:3-19; DX 153.

IRUS also pushed its contractors to accelerate their work schedules.  In June 2020, when JBS, who was hired to build access roads and pour concrete foundations for the project's 37 turbines, requested a 12-week extension to its original construction schedule because of the COVID-19 shutdown, IRUS rejected the request.  *See* PX 308 at 3-6.  As IRUS explained to JBS, it did not understand how "a 43 day work suspension" due to the COVID-19 shutdown "translates into a 84 day schedule extension."  *Id.* at 3.  JBS responded with a new proposed schedule dated July 16, 2020, which cut down JBS's scheduled delay by approximately four weeks.  PX 417; PX 417A; Puterbaugh Dep. at 111:6-20.  For IRUS, JBS's original proposal for a 12-week delay would have placed a 2020 COD out of reach.  *See* Tr. at 964:15-23.  By contrast, the four weeks saved in JBS's revised schedule preserved the possibility, albeit slim, that the Cassadaga Project would reach a COD within 2020.  *See id.* at 964:24-965:16; Puterbaugh Dep. at 113:1-4.

#### B.    RWE Acquires IRUS; Keeps 2020 COD for Cassadaga

RWE's acquisition of IRUS's parent company closed on July 1, 2020.  *See* Tr. at 671:22-672:2.  Upon consummation of the merger and after RWE assumed control over IRUS's operations, IRUS reassigned some of the staff working on the Cassadaga Project.  For

23

example, Puterbaugh now reported to John Badeusz, RWE's North American Head of Wind

Construction, who assumed responsibility for the project.  Tr. at 858:23-859:5, 862:11-14.

 As of July 2020, IRUS (now RWE) still believed that the window for achieving a 2020

COD for the Cassadaga Project was tight but achievable.  *See* Puterbaugh Dep. at 114:5-8.  In

an email dated July 8, 2020, Walton acknowledged that "risk does exist of a 2021 COD," but

added that, "given the current progress on site, I do believe a pass to 2020 COD is still

attainable."  Walton Dep. at 33:14-21.  Badeusz, who had recently assumed responsibilities

for IRUS's projects, similarly acknowledged that same day that a "Q4 2020 COD remains the

forecast."  PX 561 at 1. In a later email dated July 28, 2020, Badeusz disagreed with the

suggestion that "COD may have slipped into Q1 2021" and said that the "current view" was

for a COD of December 30, 2020.  PX 330 at 1-2.  There were still risks, however.  On

August 11, 2020, when Badeusz provided his construction update to RWE's CEO, he listed

the date for all wind turbines generating for the Cassadaga Project as "December 31, 2020?",

with the question mark indicating that he was beginning to receive information that the

December 31, 2020 COD may not be achievable.  PX 334.  On August 13, 2020, Badeusz

reported more specifically to RWE's CEO and the head of Human Resources that the project

was "[n]ot on-schedule" and noted its COD as "December 2020? – February 2021?"  PX 338

at 1 (emphasis omitted).[4]

 Despite acknowledging that Cassadaga's 2020 COD was at risk, IRUS continued to

maintain a 2020 COD as its goal and pressed toward that goal.  Having spent hundreds of

---

[4] While Plaintiff points to Badeusz's testimony that many of the construction issues listed in his email as to the Cassadaga Project did not significantly delay its COD, Tr. at 1116:17-23, 1117:22-1118:8, 1120:25-1121:13, 1125:13-1126:2, the email nonetheless indicates several issues that IRUS would need to manage appropriately for a project that was already further from completion and had more complications than other projects, and for which an untimely resignation was problematic, *see infra* Findings of Fact § X(D).

millions of dollars on the project's construction, IRUS (and, by extension, RWE) wanted to

begin commercial operations and start generating a return on its investment as soon as

possible.  Tr. at 865:1-9.  A 2020 COD also remained significant for IRUS's growth goals;

having planned to grow its renewable-energy operations by a certain level of megawatts

in 2020 – and having relayed those goals to investors – IRUS had a strong reason to meet

those expectations.  *Id.* at 865:10-14.  IRUS further recognized that pushing the project's

COD to 2021 would significantly increase costs: IRUS would need to pay its contractors more

money for their time and dedicate internal resources to the project for longer than it had

expected.  Puterbaugh Dep. at 120:23-121:22.  IRUS would also risk further weather-related

delays as construction continued into the winter months of late 2020 and early 2021.  *Id.*  In

particular, the work involved at the end of the project's construction – erection of the wind

turbines – is more prone to delays during the winter months due to high winds, snow, and ice.

*Id.*; Walton Dep. at 34:13-18; Tr. at 603:21-25.

### C.  JBS Falls Behind Schedule

Subsequent developments in the summer of 2020 further complicated IRUS's goal of

a 2020 COD.  JBS, who had already agreed with IRUS to push back its construction schedule

by eight weeks, made slower progress on its work than expected.  *See* Puterbaugh Dep. at

130:6-14.  For example, although IRUS expected JBS to pour the first of 37 concrete

foundations for the project's turbines on July 30, 2020, JBS did not do so until August 18,

2020.  *See* PX 330 at 1; PX 391 at 1.  The causes of these delays were often beyond JBS's –

or IRUS's – control.  *See* DX 191 at 2.  Sometimes poor weather forced JBS to miss its

deadlines.  *See* Puterbaugh Dep. at 130:9.  At one point in August 2020, the local crane

operators' union "ran [JBS's] . . . crane operator off of the project unexpectedly," which

"caused a delay."  PX 392 at 1.  In other cases, COVID-19 caused the delay.  Puterbaugh Dep.

25

at 130:10.  On August 6, 2020, for example, IRUS understood that JBS had suffered another delay due to a COVID-19 outbreak among its employees, several of whom would need to quarantine.  DX 282; DX 283.

Despite these challenges, IRUS pushed JBS to stick to its revised schedule.  *See* Puterbaugh Dep. at 113:5-114:8.  Shortly after JBS poured its first foundation, Jade Walton noted JBS's lack of progress and told JBS that he had recommended that IRUS not pay JBS until it offered a plan to get back on track.  PX 392 at 3.  JBS responded that it was pursuing several acceleration measures to speed up its schedule.  *Id.* at 1.  JBS said that it had acquired a third crane and mobilized additional work crews.  *Id.*  JBS also said that it was exploring "polylithic concrete placements," by which its concrete supplier would pour the concrete for each turbine foundation in two stages, rather than in one continuous pour.  *Id.*  JBS explained that this change would allow its concrete provider to use its out-of-town drivers to pour foundations at a faster rate.  *Id.*

As IRUS pressed JBS to meet its revised schedule, however, it also discovered issues with the quality of JBS's work.  On August 25, 2020, IRUS noted a large crack – leaving a hole or void about two feet deep – in the first foundation that JBS had poured.  DX 191 at 4-5.  As IRUS noted at the time, the crack presented "a big quality problem."  *Id.* at 1.  Left unaddressed, such a crack, especially in the base of the foundation, could lead to problems as serious as a wind turbine – weighing hundreds of thousands of pounds – becoming unmoored from its foundation and falling over.  Tr. at 937:12-23.  This crack further delayed the Cassadaga Project's construction schedule in two ways.  First, JBS needed to tear down the foundation completely and pour a new one in its place.  *Id.* at 937:5-7, 938:7-11.  Second, JBS needed to pause its work until it identified what went wrong with the first foundation.  *Id.* at 938:3-6.  Without understanding why a crack in the first foundation had appeared – whether

due to poor construction methods or issues with the quality of the concrete used – JBS risked

causing future delays or quality issues when it poured the project's remaining 36 foundations.

*Id.* at 933:19-934:6, 936:25-937:2.  Demonstrating further that JBS fell behind its revised

schedule, IRUS collected liquidated damages from JBS.  *Id.* at 953:23-954:3.

###    D.  IRUS Suffers Untimely Resignation

During this time, Cassadaga's project manager Jade Walton announced that he would

be resigning.  PX 338.  For Badeusz, this resignation "was obviously a huge blow for the

project" because it hurt IRUS's "ability to manage the project effectively."  Tr. at 904:18-19,

905:3-4.  "[I]n the midst of trying to get Cassadaga fully constructed," losing the project's

primary manager was "a huge disruption in [IRUS's] ability to keep the project well managed

and underway."  *Id.* at 905:8-11.  Not many employees at IRUS or RWE had as much

"institutional knowledge in the project" as Walton.  *Id.* at 904:25; *see id.* at 904:23-905:2.

The one other employee as familiar with the project's day-to-day operation was Puterbaugh.

*See id.* at 905:20-24; PX 338 at 1.  Puterbaugh, however, was not enthusiastic about replacing

Walton as project manager.  PX 338 at 2.  Having served as Walton's supervisor, he "had

higher aspirations than just acting as the project manager on the Cassadaga project" and

viewed the new role as a demotion.  Tr. at 905:25-906:2; *see id.* at 907:4-7.  After a "[v]ery

difficult conversation" with Badeusz, Puterbaugh ultimately agreed to replace Walton as

Cassadaga's project manager.  PX 338 at 1; *see* Tr. at 907:13-16.

##    XI.  IRUS Determines that Project Will Not Reach 2020 COD

###    A.  Revision of Projected COD to 2021

By late August 2020, the Cassadaga Project's managers discussed "officially"

changing the projected COD to sometime in 2021.  PX 396 at 1; *see* Puterbaugh Dep.

at 116:4-117:2.  As discussed above, several reasons rendered a 2020 COD "highly

improbable" by this time.  Puterbaugh Dep. at 116:22.  At the outset, developmental issues

related to the project's POI location and the wetlands permit had pushed the project's

projected COD from 2019 into late 2020.  *See* DX 272 at 25-26; PX 176.  The COVID-19

pandemic inflicted "by far the biggest impact," as it "effectively delayed" the project's "civil

access road and foundation construction by eight weeks."  Puterbaugh Dep. at 137:12-14. As

construction progressed in the summer of 2020, subsequent delays and quality issues

(notwithstanding acceleration measures undertaken by JBS) prompted IRUS to conclude "that

[a 2020 COD] wasn't going to happen."  *Id.* at 137:20-23. Notably, IRUS's Milestone

Payment to Trireme was not part of these discussions about changing the project's projected

COD.  *Id.* at 592:10-13.

By September 15, 2020, IRUS was "99 percent sure" that the Cassadaga Project would

not reach a COD until 2021.  *Id.* at 136:12-137:6.  IRUS estimated a COD of March 5, 2021,

but noted that winter weather could push that date back even further.  *Id.* at 136:21-23.  IRUS

informed Plaintiffs later that month, in September 2020, of its revised projection.  PX 426;

DX 194 at 2.

IRUS did not take lightly the revision of the Cassadaga Project's projected COD

to 2021.  The project's managers knew that this revision would be "poorly received" at

Innogy and that "there would be a lot of disappointment."  Puterbaugh Dep. at 117:23-119:5.

As discussed above, Innogy (and, by extension, RWE) had approved the spending of roughly

$350 million with the expectation that the project would come online and begin generating

revenue by December 31, 2020.  Tr. at 942:8-22.  Changing that estimate would have "very

negative implications" for IRUS's earnings and growth projections.  *Id.* at 942:21-22.  The

Court finds credible Badeusz's testimony that IRUS revised the projected COD to 2021 only

after confirming that it had tried everything within its power to complete the project in 2020.

*Id.* at 940:7-18.  Puterbaugh credibly testified that he was unaware of any conversation among his colleagues about avoiding the Milestone Payment to Trireme if Cassadaga's COD was moved to 2021.  Puterbaugh Dep. at 552:17-23.

**B.  RWE's Other Projects Miss Projected 2020 COD**

Missing the Cassadaga Project's projected 2020 COD, while disappointing to IRUS, was not altogether surprising.  At least four other wind farms owned by RWE missed their projected 2020 COD.  Tr. at 948:3-949:12; *see* PX 334.  For each one, the effect of the COVID-19 pandemic compounded other challenges to prevent the project from reaching its target COD in 2020.  Tr. at 949:4-12.

**C.  Even Under 2021 COD, IRUS Maintains Pressure**

Even after recognizing that a projected COD of 2020 for the Cassadaga Project was unrealistic, IRUS's aim was still to complete the project as soon as possible.  *Id.* at 945:6-10; Puterbaugh Dep. at 140:10-11.  As late as September 4, 2020, IRUS pushed JBS to maintain its construction schedule, even over a holiday weekend.  *See* DX 289.  IRUS noted the deficiencies and delays in JBS's performance and stated that JBS's "lack of timely progress is absolutely killing us."  *Id.* at 1.

**XII.    Completion of the Cassadaga Project**

Ultimately, the Cassadaga Project reached its COD on August 26, 2021 – eight months after the December Milestone date.  DX 220.  In addition to the issues described above, the project "ran into a number of problems" in building the underground collection system, that is, the electrical wiring that connects the turbines to each other.  Tr. at 967:3-10.  Fluid used to lubricate some of the project's drills "caused an environmental issue" when it spilled into a nearby pond.  *Id.* at 967:11-16.  Workers had to "stop work, clean up the pond . . . and get

approval that th[e] environmental cleanup was adequate and complete before [they] could

begin work again." *Id.* at 967:16-19.

IRUS did not pay Trireme the $69.7 million Milestone Payment for the Cassadaga

Project. *Id.* at 846:1-6.  With the late COD, IRUS (now RWE) incurred the costs associated

with carrying its investment of approximately $350 million for an extra eight months past the

projected 2020 COD with no return.  *Id.* at 947:9-16.

### CONCLUSIONS OF LAW

As discussed above, Trireme brings claims against IRUS for: (1) a breach of the

implied covenant of good faith and fair dealing; and (2) a breach of Section 7.6(b) of the

Merger Agreement for failure to provide timely reports on the Cassadaga Project's

development.  Trireme also seeks a declaration that Innogy is jointly and severally liable,

pursuant to a parent guarantee, for any damages awarded in this case.  The Court addresses

each claim in turn.

As a preliminary matter, the parties agree, and the Court concludes, that New York

law governs this dispute.  Generally, a federal court sitting in diversity applies the choice-of-

law rules of the state in which it sits.  *See Petróleos de Venez., S.A. v. MUFG Union Bank,

N.A.*, 51 F.4th 456, 467 (2d Cir. 2022).  Under New York choice-of-law rules for cases

involving a contract with a choice-of-law clause, such as the Merger Agreement, the court

"appl[ies] the law selected in the contract as long as the state selected has sufficient contacts

with the transaction."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK)

Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).  Here, because the Cassadaga Project is itself in New

York, the Court finds sufficient contacts between New York and the transactions undertaken

through the Merger Agreement to justify the parties' chosen application of New York law.

Therefore, the Court applies New York law in interpreting the contract.

The Merger Agreement's choice-of-law clause also applies to Plaintiffs' claims. Plaintiffs' claim for a breach of Section 7.6(b) of the Merger Agreement arises, by definition, from the Merger Agreement, so New York law applies.  Plaintiffs' implied-covenant claim similarly arises from a breach of the Merger Agreement.  *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (noting that, under New York law, a breach of the implied duty of good faith "is merely a breach of the underlying contract" (citation omitted)).  Therefore, Plaintiffs' implied-covenant claim is a "claim . . . directly or indirectly based upon or arising out of th[e] [Merger] Agreement," which is governed by New York law. Agreement § 13.5.

### I.   Implied Covenant of Good Faith and Fair Dealing

Trireme admits that nothing in the Merger Agreement expressly states that IRUS was required to complete the construction of any project, to accelerate or expedite the construction of a project, or to spend any amount of money on a project's construction.  Tr. at 322:15-25. Instead, Plaintiff claims that IRUS breached the implied covenant of good faith and fair dealing by failing to reach COD by December 31, 2020, in order to deprive Plaintiff of the $69.7 million Milestone Payment.  SAC ¶¶ 116-129.

### A.   Applicable Law

"Under New York law, a covenant of good faith and fair dealing is implicit in all contracts."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007); *accord Singh v. City of New York*, 217 N.E.3d 1, 5 (N.Y. 2023).  Included in this covenant is a pledge that "neither party shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (alterations adopted and quotation marks and citation omitted).

"Where the contract contemplates the exercise of discretion, [the duty of good faith and fair dealing] includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023) (citation omitted).

This covenant, however, "does not include any term inconsistent with the terms of the contractual relationship, or create duties which are not fairly inferable from the express terms of that contract." *Kitchen Winners NY Inc. v. Rock Fintek LLC*, --- F. Supp. 3d ----, 2023 WL 2746031, at *14 (S.D.N.Y. Mar. 31, 2023) (citation omitted); *accord Singh*, 217 N.E.3d at 5-6; *see Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) (noting that "the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties"). "Nor can it be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Kitchen Winners*, 2023 WL 2746031, at *14 (quotation marks and citation omitted). And most importantly, the implied covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y,* 769 F.3d 807, 817 (2d Cir. 2014) (quotation marks and citation omitted).

Establishing a breach of the implied covenant further requires the plaintiff to "show substantially more than evidence that the defendant's actions were negligent or inept." *Id.*; *see Tractebel Energy Mktg., Inc.*, 487 F.3d at 98 (recognizing a "presumption that all parties act in good faith" (citation omitted)). "The plaintiff must instead demonstrate something more, such as that the defendant 'acted arbitrarily or irrationally in exercising the discretion' afforded to it under the contract." *Sec. Plans, Inc.*, 769 F.3d at 818 (alterations adopted) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). "[I]ntentional acts

done without the purpose of cheating the plaintiff" are insufficient to establish a breach of the

implied covenant. *Thompson v. Advanced Armament Corp.*, 614 F. App'x 523, 525 (2d

Cir. 2015) (summary order). "[O]nly in a narrow range of cases" will the Court find such a

breach, *Sec. Plans, Inc.*, 769 F.3d at 817, such as when a party "exercises its discretion

malevolently, for its own gain as part of a purposeful scheme designed to deprive its

counterparty of the benefits of a contract," *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 F.

App'x 69, 72 (2d Cir. 2021) (summary order) (alteration adopted and quotation marks and

citation omitted). "Conduct which reaches the level of reckless disregard may be sufficient to

evidence a breach of the implied covenant of good faith, but only if it is severe enough to

warrant an inference that the party acted in bad faith, or intended to do harm." *Lykins v.

IMPCO Techs., Inc.*, No. 15-cv-02102 (PGG), 2018 WL 3231542, at *8 (S.D.N.Y. Mar. 6,

2018) (citation omitted).

      "While courts generally find that a defendant violates the covenant of good faith and

fair dealing only when he acts with some improper motive, a plaintiff need not present direct

evidence of an improper motive." *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731

(S.D.N.Y. 2020) (quotation marks and citation omitted). "Rather, bad faith can be inferred

from evidence that the defendant's conduct was arbitrary or contrary to reasonable

expectations." *Id.*; *see Cont'l Ins. Co. v. NLRB*, 495 F.2d 44, 48 (2d Cir. 1974) (explaining

that, because "it would be extraordinary for a party directly to admit a 'bad faith' intention, [a

party's] motive must of necessity be ascertained from circumstantial evidence . . . the

determination of intent must be founded upon the party's overall conduct and on the totality of

the circumstances, as distinguished from the individual pieces forming part of the mosaic").

**B. Analysis**

There is no direct evidence that IRUS delayed, stopped, or paused construction of the Cassadaga Project to deprive Plaintiffs of the Milestone Payment. The Court finds credible the consistent testimony of IRUS's current and former employees who testified that they did not act – nor even discuss acting – in this manner.

Recognizing that bad faith can be inferred from the conduct of a party, even without direct evidence, the Court finds that IRUS's conduct does not support an inference that IRUS acted in bad faith to delay the construction of the Cassadaga Project to deprive Plaintiff of the Milestone Payment. *See Dreni*, 486 F. Supp. 3d at 731. On the contrary, the IRUS employees most responsible for the Cassadaga Project's development and construction testified credibly and consistently that IRUS undertook significant efforts to complete the Cassadaga Project by the end of 2020. Within a week of assuming control over the project, IRUS applied to the Army Corps of Engineers in August 2018 for a wetlands permit. Once it finally received that permit in December 2019, nearly seventeen months later, IRUS immediately began construction, even paying one contractor over $500,000 to accelerate its work. Although COVID-19 shut down construction for another two months, IRUS secured an exemption to continue working on part of the project.

Even after the safe-harbor extension, IRUS continued to target, and worked diligently towards, the Cassadaga Project's commercial operation by the end of 2020. On the same day that New York lifted its COVID-19 shutdown, IRUS asked its contractors to remobilize. DX 153. IRUS even denied one contractor's request for more time to remobilize and negotiated a shorter timetable for remobilization. PX 417 at 2; Puterbaugh Dep. at 111:6-20. As that contractor fell behind schedule, IRUS threatened to withhold payment unless it implemented acceleration measures. PX 392 at 3. IRUS, however, was made aware of issues

with the quality of the contractor's work, including a large crack in the foundation of one of the wind turbines.  DX 191 at 4-5.  And when Cassadaga's project manager resigned unexpectedly, IRUS replaced him quickly with the person remaining with the most relevant knowledge of the project.  PX 338; Tr. at 907:13-16.  Ultimately, the project's slow progress prompted IRUS in September 2020 to push its projected COD to 2021.  Even then, however, IRUS continued to try to complete the project as soon as possible.

Steps taken after the safe-harbor extension – including the rapid notification that contractors could resume construction; the pressure on JBS to provide a shorter replacement schedule; the request for JBS to implement acceleration measures; and the prompt substitution of an unwilling Puterbaugh for Walton as project manager – are all inconsistent with an intent or goal to delay or slow construction of the Cassadaga Project to deprive Plaintiffs of the Milestone Payment.  Had IRUS endeavored to push the project's COD into 2021, it could have relied on any one of these opportunities as an excuse to do so.  It could have, for example, accepted JBS's proposed schedule that delayed the project by 12 weeks, or taken more time to replace Walton at the project's helm.  The company's efforts to press for a 2020 COD despite these challenges refute the suggestion that IRUS acted with bad faith.  The testimony given at trial and in prior depositions admitted at trial confirms that the project's eventual completion in 2021 was due to an already tight schedule further complicated by the COVID-19 pandemic and contractor issues, not a deliberate choice to avoid the Milestone Payment and deprive Plaintiffs of the "fruits of the contract."  *Spinelli*, 903 F.3d at 205 (citation omitted).

Plaintiffs have not identified any evidence from the record that anyone on the Cassadaga Project acted in bad faith.  Plaintiffs' corporate representative testified that Plaintiffs' allegations are not based on direct "firsthand knowledge" of bad faith, but rather on

an inference drawn from the circumstances of the Cassadaga Project's completion.  Tr.

at 359:14-360:12.  But nothing in the testimony presented or the voluminous documents

admitted proves that IRUS purposely slowed or stopped construction for the purpose of

depriving Plaintiffs of the Milestone Payment.  Instead, the evidence confirms that IRUS

continued targeting a 2020 COD and its decision to push commercial operation of the

Cassadaga Project to after December 31, 2020 was not done "malevolently, for its own gain"

but rather was a reluctant conclusion reached after a series of delays beyond its control.

*Najjar Grp., LLC*, 850 F. App'x at 72 (citation omitted).

Having previously offered several theories of Defendants' breach of the implied

covenant, Plaintiffs ultimately argued, after the evidence was presented at trial, that IRUS

acted in bad faith to delay construction by abusing its discretion under the Merger Agreement

by making an irrational, arbitrary, and otherwise uninformed decision in September 2020 to

change Cassadaga's projected COD to 2021.  *Compare* ECF No. 224 at 47-58 (arguing that

IRUS did not use commercially reasonable efforts to try to achieve COD in 2020; that IRUS

slacked off; and that IRUS abused its discretion in deciding not to accelerate construction),

*with* ECF No. 253 at 42-46 (updated conclusions of law focusing on abuse of discretion); *see*

Tr. at 1190:9-11 (arguing in summation that "[w]hat the case is about is, why did they change

the COD on September 1?  What was the basis for that decision?  It was arbitrary and

irrational.").  According to Plaintiffs, Defendants acted in bad faith because, in July 2020,

RWE "took over a project that was on schedule to complete COD in 2020," but, around

September 1, 2020, changed its projected COD to 2021 without any explanation or support in

the record.  ECF No. 253 at 43-44.

Based on the evidence presented at trial, the Court finds that Defendants did not act

"arbitrarily or irrationally in exercising" their discretion under the Merger Agreement or

otherwise. *Cordero*, 211 N.E.3d at 670 (citation omitted).  As discussed above, the premise that the Cassadaga Project was consistently "on schedule" for completion in 2020 until an irrational and arbitrary decision was made in early September 2020 to change the projected COD to 2021 is belied by extensive evidence to the contrary.  From the start, developmental setbacks with National Grid's Facility Study, the wetlands permit, and the POI location compressed the time that IRUS had to complete the project in 2020, each of which was not anticipated at the time of the Merger Agreement's signing.  Construction did not begin until the winter of 2019, when delays are common.  COVID-19 soon shut down most construction for two months and further slowed progress when work resumed.  Even after implementing acceleration measures, contractors on the project suffered still more delays and quality issues until IRUS ultimately concluded that, despite its best efforts, it could not complete the project as quickly as the parties had expected.  That the project's official COD target remained 2020 for so long illustrates to the Court more that IRUS was determined to complete the project by the end of 2020 – even after the safe-harbor tax-credit extension – rather than that IRUS acted or intended in bad faith to delay and avoid a Milestone Payment to Plaintiffs.  If anything, the continued drive toward 2020 reflected the company's continued hope and desire that, despite the mounting obstacles in its path, it could complete the project by the end of 2020.  This does not show bad faith.

Plaintiffs' suggestion that RWE acted "without a sound basis in reason and without regard to relevant facts" when it ultimately determined that the COD would likely move to 2021 mischaracterizes the deliberation with which Defendants monitored Cassadaga's progress, considered ways to speed up construction, and eventually decided to adjust their timeline.  ECF No. 253 at 43.  The evidence shows that, by September 2020, the project, already on a compressed timetable for construction, had suffered delays from COVID-19 and

performance issues with JBS (including a large crack in the first foundation that it poured,

behind schedule). IRUS weighed a range of acceleration options often used on other

construction projects but ultimately concluded that, due to COVID-19 and subsequent supply-

chain issues, those options were not available here. *See* Puterbaugh Dep. at 129:12-22, 131:1-

133:16, 213:18-22. For example, IRUS considered accelerating JBS's schedule for pouring

turbine foundations but decided that such measures would be unlikely to accelerate the overall

schedule. *Id.* at 114:1-8. IRUS also considered options as drastic as firing JBS or hiring an

additional contractor. Tr. at 956:4-18. Ultimately, however, IRUS concluded that it would

have been too difficult to find another contractor that was certain to perform better than JBS

in the limited time available. *Id.* IRUS opted instead to try to work with JBS, monitor it, and

push the contractor to stay on course. *Id.* at 956:15-18. As Badeusz credibly testified at trial:

"[I]f somebody had a silver bullet to create a solution for all the problems we encountered on

that project, I would have bought it." *Id.* at 950:25-951:2. Against this backdrop, the decision

to push the project's official COD to 2021 was reasoned and deliberate. Plaintiffs cannot

attribute arbitrariness to a decision while ignoring the full set of experiences and analysis on

which it rested. Though that decision "incidentally lessen[ed]" Plaintiffs' "expected benefit,"

it was not arbitrary. *Sec. Plans, Inc.*, 769 F. 3d at 817 (quotation marks and citation omitted).[5]

    The project's completion in late August 2021 further cuts against the suggestion that

IRUS lacked a factual basis for its decision to move the projected COD or in bad faith delayed

---

[5] Given the circumstances and issues surrounding Cassadaga's construction that were
presented during the trial and in the communications between Puterbaugh and Badeusz, the
Court does not agree with Plaintiffs' contention that the lack of a written cost-benefit analysis
and revised integrated project-management schedule in September 2020 proves that IRUS
acted arbitrarily and irrationally when it recognized that the Cassadaga Project's COD would
likely push into 2021. *See* Tr. 960:2-961:5 (Badeusz testifying that fully integrated schedules
are rarely used in wind-farm construction).

the project to deprive Plaintiffs of their Milestone Payment.  IRUS incurred significant costs associated with eight additional months of construction and forewent generating any commercial revenue on the project during that time.  *See* Tr. at 947:9-16.  Had IRUS decided to move the project's COD to 2021 without reference to the project's actual progress on the ground or to disadvantage Plaintiff, it likely would have completed construction shortly after December 31, 2020.  That the Cassadaga Project did not begin commercial operations until August 2021 suggests that there were legitimate construction reasons that delayed the project's COD past 2020.  Plaintiffs do not square this timeline with their characterization of IRUS's behavior.  IRUS benefitted from the Cassadaga Project only upon its completion and Plaintiff's speculation that IRUS acted in bad faith, against its own interests in delaying the project until August 2021, is belied by the record.  *See InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 568 (S.D.N.Y. 2021) (declining to find that defendant failed to market a product diligently where the defendant "only benefited from the Agreement by actually selling the Products").

Insofar as Plaintiffs argue that IRUS acted in bad faith by "slacking off," the Court finds no evidence that IRUS slacked off or failed to act, let alone that it did so "directly to impair the value of the contract for" Plaintiffs.  *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991).  As discussed above, IRUS diligently worked throughout the project's development and construction to minimize delays and complete the project by the end of 2020.  At times, IRUS paid a premium to accelerate work on the project.  PX 188.  Even after the IRS extended the safe-harbor deadline, IRUS nevertheless pressed forward in trying to achieve COD in 2020.  IRUS pressured its contractors to accelerate their work to meet their agreed-upon schedules – at some points threatening to withhold pay, and even collecting liquidated damages.  PX 392 at 3; Tr. at 953:23-954:3.  None of these facts suggests that

Defendants paused their efforts upon receiving the safe-harbor extension, that they looked for excuses to delay, or that they slowed their progress to deprive Plaintiffs of the Milestone Payment. Each of IRUS's witnesses testified, credibly, that they were never told to stop, delay, or slow the pace of construction.

Insofar as Plaintiffs maintain that IRUS could have, and should have, done more to complete the Cassadaga Project by the end of 2020, this is not the test for bad faith. *See Sec. Plans, Inc.*, 769 F.3d at 817 ("A plaintiff [making an implied-covenant claim] must show substantially more than evidence that the defendant's actions were negligent or inept."); *InspiRx, Inc*, 554 F. Supp. 3d at 567-68 (declining to find that defendant acted in bad faith by failing to market a pharmaceutical product diligently where the defendant hired 120 sales representatives to market a different drug and reduced its marketing budget for the product); *Lykins*, 2018 WL 3231542, at *10 (deeming evidence that the defendant "mismanaged" a business recently acquired from the plaintiff insufficient to prove bad faith where there was "simply no evidence that [the defendant's] allegedly poor and incompetent management decisions were taken with the purpose of depriving Plaintiffs of their earn-outs" (quotation marks and citation omitted)). The Court declines to infer bad faith from Defendants' choices in navigating a difficult situation made still more difficult by the onset of a global pandemic.

In any event, Plaintiffs have not provided evidence that IRUS could have even reached COD for the Cassadaga Project in 2020 if it had done more. Plaintiffs rely on testimony from two expert witnesses – Michael Hickey and Mark Mezyk – to argue that the Cassadaga Project could have reached a 2020 COD by using standard acceleration measures. *See, e.g.*, Tr. at 449:8-14, 544:10-12. The Court does not credit this testimony in that regard.

As an initial matter, both experts have significant gaps in their experience that discount the value of their opinion on this point. Hickey has never worked on a construction

project in New York.  *Id.* at 613:12-19.  Of the projects he worked on in 2020, none was in a state that experienced a shutdown due to COVID-19 that was as long as New York's.  *Id.* at 501:20-502:12.  Hickey's wind-construction experience is also limited to work for contractors, not developers, so he likely does not have experience managing the schedule for an entire project.  *Id.* at 501:13-19.  Meanwhile, Mezyk has no experience with the construction of a wind farm, either as a contractor or as a developer.  *Id.* at 611:17-612:17.  To the extent that Mezyk has some experience in serving as an expert on other disputes involving wind-farm projects, none of those projects was in New York.  *Id.* at 613:12-19.

More fundamentally, neither Hickey nor Mezyk testified that the Cassadaga Project could have achieved a COD in 2020.  Hickey assumed, without further analysis, that those "common acceleration techniques could have been employed here on the Cassadaga project." Tr. at 496:15-21; *see id.* at 492:17-23.  Hickey testified that acceleration measures such as adding more workers "could potentially have been applied," but he acknowledged that more analysis was needed to determine if the measures "could actually have been applied."  *Id.* at 499:9-19.  Mezyk, for his part, conceded that implementing his proposed acceleration measures would not have guaranteed the Cassadaga Project's COD by the end of 2020.  *Id.* at 641:20-642:3.  Mezyk could not point to another construction project in New York during the COVID-19 pandemic that was able to, as he suggested, double the number of workers or equipment to accelerate the project's completion.  *Id.* at 625:5-25.  Nor did he consider the challenges that COVID-19 presented at the Cassadaga site, such as the workers who tested positive or the COVID-19 protocols adopted by several contractors and subcontractors.  *Id.* at 617:5-13, 619:3-620:9, 627:7-22.  Neither expert took any steps to determine whether the labor or equipment arguably needed to complete Cassadaga within 2020 was available, especially in light of COVID-19's impact.  *Id.* at 490:4-24, 623:22-625:4, 632:13-633:12.

Without further analysis of the availability of additional labor and equipment during this time, the Court does not credit the assertion that, had IRUS hired more workers or staffed them for longer hours (assuming that it could get the requisite approvals under its Article 10 permit to do so), it might have achieved COD in 2020. Instead, the Court credits the testimony of those who actually worked on the Cassadaga Project, with experience in wind-farm development and construction, and who testified to the various reasons why a COD in 2020 was not attainable.

Plaintiffs' reliance on the IRS's extension of the safe-harbor tax-credit deadline, which allegedly reduced IRUS's incentives under the Merger Agreement to complete the Cassadaga Project by 2020, does not support a finding of bad faith either. That the renewable-energy industry group lobbied for and obtained an extension of the tax-credit safe harbor amid an unprecedented global pandemic does not constitute bad faith on IRUS's part, even if the parties did not anticipate this extension when they entered into the Merger Agreement. *See Sec. Plans, Inc.*, 769 F.3d at 817 (implied covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit" (quotation marks and citation omitted)). And the Court does not see any evidence that IRUS paused, slowed, or stopped construction efforts on the Cassadaga Project after the safe-harbor extension was granted; on the contrary, the evidence supports the Court's finding that IRUS continued to diligently work toward a 2020 COD after the safe-harbor extension. Defendants testified credibly that they had strategic goals surrounding a 2020 COD and used their best efforts to meet those goals.

The December Milestone was tied to a certain date, not to the receipt of tax credits. Though it may have been advantageous in retrospect for Plaintiffs to have negotiated for different milestone triggers (and it appears as if Spencer wishes that he had), the December

42

Milestone as written in the Merger Agreement is the bargain for which the parties contracted.
That Defendants were not bound to make the Milestone Payment despite receiving an extra
year to qualify for the tax-credit safe harbor does not "violate the party's presumed intentions
or reasonable expectations." *Spinelli*, 903 F.3d at 205 (quotation marks and citation omitted);
*see Butvin v. DoubleClick, Inc.*, No. 99-cv-04727 (JFK), 2001 WL 228121, at *9 (S.D.N.Y.
Mar. 7, 2001) (observing that a plaintiff who was fired before his stock options vested "might
feel ill-used but he cannot argue that he had been deprived of anything to which he was
entitled"), *aff'd*, 22 F. App'x 57 (2d Cir. 2021) (summary order).[6]

    To the extent that Plaintiffs claim that IRUS did not undertake commercially
reasonable efforts to achieve COD by 2020, their argument is misplaced.  The Merger
Agreement at Section 7.6(a) required IRUS to "use commercially reasonable efforts . . . to
*develop* the [Cassadaga Project]" (emphasis omitted).  Annex 2, which Section 7.6(a)
references, describes the standards of care for various tasks, all associated with development:
IRUS was to "[m]aintain land to support required project facilities," "[m]aintain [its] queue
position" on the New York Independent System Operator's list of proposed energy projects
seeking to join the power grid, "[c]ontinue [the] Article 10 permitting process" to receive state
approval for the project's construction, and "[m]aintain [the project's] existing [power
purchase agreements] in good standing."  Agreement § Annex 2.  None of these goals
concerns the construction of the Cassadaga Project.  Missing from Section 7.6(a) is any
language requiring IRUS to take steps to *construct* the project or pursue a 2020 COD in line

---

[6] Although Plaintiffs no longer seem to make the argument, the Court does not find evidence
of bad faith from IRUS's early financial analyses noting that it would not owe a Milestone
Payment if the Cassadaga Project failed to reach COD in 2020.  IRUS behaved as a
reasonably prudent corporation in considering the various scenarios and weighing its options
under the Merger Agreement.

with a commercially reasonable standard of care.  *See* Tr. at 172:9-173:8, 322:2-25.  To conclude otherwise would "create duties . . . not fairly inferable" from the terms of the Merger Agreement.  *Kitchen Winners*, 2023 WL 2746031, at *14 (citation omitted).[7]

Even if there were such a requirement, though, the Court finds, for the reasons previously stated, that IRUS's efforts in constructing the Cassadaga Project were commercially reasonable.  The Court credits the testimony of IRUS's witnesses and finds that IRUS worked diligently to attempt to achieve COD by 2020.  Plaintiffs have not presented credible evidence (through their experts or otherwise) of a commercially reasonable efforts standard for the Cassadaga Project's construction that IRUS did not meet.  *See Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 472 (S.D.N.Y. 2018) ("When the term 'commercially reasonable efforts' is not defined by the contract, courts in this district require the party seeking to enforce the efforts provision to establish the objective standard by which the breaching party's efforts are to be judged, in the context of the particular industry."), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order); *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 381 (S.D.N.Y. 2014) (finding no evidence establishing objective standard for "commercially reasonable efforts" in FDA-regulatory context).

---

[7] Plaintiffs' attempt to graft a commercially-reasonable-efforts requirement from Section 7.6(a) onto IRUS's construction obligations with respect to the December Milestone conflicts not only with the text of the Merger Agreement but also with their litigation stance taken at an earlier stage of this case.  In its previous opinion on Defendants' motion to dismiss, the Court declined to dismiss Plaintiffs' claim for breach of the implied covenant as duplicative of their claim for breach of contract.  *See Trireme*, 2021 WL 3668092, at *5-8.  In doing so, however, the Court noted that "Plaintiffs are now bound by their litigation strategy adopted in response to Defendants' motion," such that even if Innogy's decision to push COD to 2021 was a product of "conduct that might violate a commercially reasonable efforts clause but does not support the conclusion that Innogy acted in bad faith, Plaintiffs may not pivot to pursuing that conduct as part of their breach of contract claim."  *Id.* at *8 n.6.

The Court is not persuaded by Plaintiffs' reliance on *Capax Discovery, Inc. v. AEP RSD Investors., LLC*, No. 17-cv-00500, 2021 WL 3909857 (W.D.N.Y. Sept. 1, 2021), *aff'd sub nom. Baiocco v. AEP RSD Invs., LLC*, No. 21-2475, 2022 WL 2902081 (2d Cir. July 22, 2022) (summary order).  There, the court found a breach of the implied covenant of good faith and fair dealing, concluding that the defendant had "intentionally delayed" payments to the plaintiff "in bad faith in order to reduce the amount of" the earn-out payment owed.  *Id.* at *10.  Here, however, the Court finds no evidence, either direct or by inference, that Defendants delayed construction of the Cassadaga Project to deprive Plaintiffs of the Milestone Payment.  Whereas the defendant in *Capax* had "no legitimate business reason for delaying payment," *id.* at *7, several legitimate reasons (as described above) delayed Defendants' commercial operation of the Cassadaga Project past 2020.  The Court does not infer an intent to delay from Defendants' response to these setbacks.  *See, e.g.*, *Wagner v. JP Morgan Chase Bank*, No. 06-cv-03126 (RJS), 2011 WL 856262, at *4-5 (S.D.N.Y. Mar. 9, 2011) (evidence that the defendant failed to fund research and development, imposed hiring freezes and cost-cutting measures, fired key personnel, closed an important office, and eliminated software development work did not show "that Defendant's management decisions were intended to deprive Plaintiffs of the earn-out payments"); *Keene Corp. v. Bogan*, No. 88-cv-00217 (MBM), 1990 WL 1864, at *14-15 (S.D.N.Y. Jan. 11, 1990) (evidence of the defendant's alleged mismanagement – including poor quality control, misguided pricing policies, the shipment of defective parts, a failure to adhere to contract delivery schedules, and a failure to adopt the opinions of veteran employees on the business – did not support an inference of bad faith where the plaintiff had not shown that the defendant "adopted these policies with the purpose of or [in] reckless disregard for losing money"); *Fireman v. News Am. Mktg. In-Store. Inc.*, No. 05-11740, 2009 WL 3080716, at *11 (D. Mass. Sept. 26, 2009)

45

(applying New York law and rejecting implied-covenant claim where defendant's decisions to rebrand the company acquired from plaintiff and to reorganize its core team "[a]t most . . . show[ed] strategic disputes between sophisticated businesspeople as to how [the company] should have been run").

For all of these reasons, having reviewed the evidence in light of the applicable law, the Court does not find that Plaintiff has proven that IRUS breached the implied covenant of good faith and fair dealing by delaying the construction of the Cassadaga Project to deprive Plaintiffs of the December Milestone.

## II.   Breach of Contract Under Section 7.6(b)

Section 7.6(b) provides that IRUS "shall keep [Plaintiffs] informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the development of [the Cassadaga Project], by delivering information" in an agreed-upon form to "an individual appointed by [Plaintiffs], who shall initially be James Spencer."  Agreement § 7.6(b).  The section adds that IRUS "shall also reasonably cooperate with [Spencer] to respond to [his] reasonable ad-hoc inquiries regarding the development of [the Cassadaga Project]; provided, however, [Spencer] shall limit such inquiries to a reasonable level, taking into account the stage of development of the applicable Key Project."  *Id.*

Under its breach-of-contract claim, Trireme asserts that IRUS breached Section 7.6(b) of the Merger Agreement by failing to provide a timely update on the Cassadaga Project's development for the second quarter of 2020 and by failing to timely respond to James Spencer's inquiries about Cassadaga between April 1, 2020, and September 18, 2020. Trireme seeks damages in the amount of the December Milestone: $69.7 million.  SAC ¶ 157.

### A.  Legal Standard

Under New York law, the elements of a claim for breach of contract are (1) the

existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). The parties do not dispute the first two elements of Trireme's claim: the Merger Agreement is a valid, enforceable agreement, and Trireme performed its contractual obligations by transferring its projects under development to IRUS. The Court finds, however, that Plaintiffs have not shown a breach of Section 7.6(b) or that damages resulted from that breach.

Under New York law, courts are to give the "words and phrases in a contract . . . their plain meaning" and construe the contract "so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations adopted and citation omitted). "Only where a contract's terms are ambiguous can extrinsic evidence be used to aid interpretation." *Tang Cap. Partners, LP v. BRC Inc.*, --- F. Supp. 3d ----, 2023 WL 2396635, at *7 (S.D.N.Y. Mar. 8, 2023). However, contract terms are ambiguous if they "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)). "Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized [and] the court must be informed of the meaning of the language as generally understood in that business, in the light of the customs and practices of the business." *Id.* (quoting *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466). "Proof of custom and usage does not mean proof of the parties' subjective intent" but

rather serves as "proof that the language in question is fixed and invariable in the industry in question." *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466 (quotation marks and citation omitted).

Under New York law, "[c]ausation is an essential element of damages" for breach-of-contract claims. *Nat'l Mkt. Share, Inc.*, 392 F.3d at 525. "[A] plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Id.* Damages must be "directly traceable to the breach, not remote or the result of other intervening causes." *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 445 (S.D.N.Y. 2018) (citation omitted), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (summary order). "Where a party has failed to come forward with evidence sufficient to demonstrate damages flowing from the breach alleged and relies, instead, on wholly speculative theories of damages," the breach-of-contract claim fails. *Id.* at 446 (citation omitted). A breach need not be the sole cause of a party's damages, but must be a "substantial factor" such that it "would be thought of by people generally as having operated to an important extent in producing the harmful result." *Coastal Power Int'l, Ltd. v. Transcontinental Cap. Corp.*, 10 F. Supp. 2d 345, 366 (S.D.N.Y. 1998) (citations omitted), *aff'd*, 182 F.3d 163 (2d Cir. 1999).

**B. Breach**

As discussed above, Section 7.6(b) of the Merger Agreement required IRUS to provide quarterly development updates to Trireme, and to respond to "reasonable ad-hoc inquiries" from James Spencer regarding the development of the projects. Agreement § 7.6(b). On March 31, 2020, IRUS emailed a quarterly development report to Spencer, who responded the next day with a request for additional information on the status of construction at Cassadaga. PX 233. An IRUS employee responded that the project was "on track for a Q4 2020 COD" but that "the rapidly evolving COVID-19 situation in New York may result in a

temporary shutdown of our construction activities at Cassadaga." *Id.* at 1.  The IRUS

employee further responded that "[t]his is a dynamic situation" and that he would provide

"info on the construction status." *Id.*  Spencer sent an additional request for information on

May 19, 2020, seeking information as to interconnection costs, power purchase agreements,

and IRUS's "current expectation" for the Cassadaga Project's COD as reflected in a current

construction schedule.  PX 281; PX 281A.  On June 8, 2020, Trireme's outside counsel gave

notice to IRUS of a potential breach of the Merger Agreement, noting Trireme's concern that

IRUS was "intentionally delaying the Project to evade making the Payment Milestone

Amount" and that IRUS had ignored Spencer's recent requests for information.  PX 293 at 2-

3.  IRUS's outside counsel responded on June 22, 2020, denying Trireme's characterization of

IRUS's conduct in progressing the project and stating that IRUS was "preparing responses to

Mr. Spencer's inquiries, and intends to respond to Mr. Spencer soon."  PX 306 at 4.  When

Spencer did not receive a response, he pressed again on September 1, 2020, asking about

IRUS's "current expectation" for the Cassadaga Project's COD.  PX 399.  On September 18,

IRUS sent Spencer a report for the second quarter of 2020 with updates on six projects,

including Cassadaga, which had been finalized by July 2, 2020, but had inadvertently not been

sent.  PX 415.  On September 26, 2020, IRUS informed Spencer that the project's estimated

COD had changed to March 5, 2021.  PX 426.

   As for the ad hoc requests, IRUS was not untimely in its responses because the Merger

Agreement does not set a deadline for responding to Spencer's ad hoc requests, and IRUS did

ultimately respond to the requests.  A dialogue existed between the parties, with responses

from IRUS and its outside counsel on April 1, 2020, and June 22, 2020.  However, IRUS's Q2

2020 development report, with updates on numerous Key Projects, was delayed until

September 2020.

Even if responses were untimely, IRUS committed no breach of the Merger Agreement as to the provision of any untimely construction information because Section 7.6(b) required IRUS only to respond to ad hoc inquiries "regarding the *development* of [the Cassadaga Project]" and to "keep [Plaintiffs] informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the *development* of each Key Project." Agreement § 7.6(b) (emphasis added). The quarterly update requirement was about the "development of" the Key Projects. *Id.* By the time of Spencer's first inquiry in April 2020, the Cassadaga Project had finished development and started construction. Testimony from the parties' witnesses confirmed that, at least within the wind-energy industry, "development" and "construction" have "fixed and invariable" meanings. *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466 (citation omitted). While "development" consists of the work involved prior to the physical construction of the project, "construction" refers to the actual building of the project. *See, e.g.*, Young Dep. at 110:7-16; Tr. at 168:15-169:3. Because Spencer's requests were for information on the Cassadaga Project's construction, not its development, IRUS did not breach Section 7.6(b) by failing to provide information on that subject as quickly as Spencer would have liked. Similarly, because development on the Cassadaga Project had been completed by June 30, 2020, the Q2 2020 development report – which primarily included development updates on other Key Projects – was not required, and therefore not untimely, under the Merger Agreement.

### C. Damages

Even if Defendants had breached Section 7.6(b) by failing to timely provide the requested information to Spencer, the Court finds no damages "directly traceable" to this breach. *Wilder*, 310 F. Supp. 3d at 445 (citation omitted). Trireme argues that, had it received the requested information promptly, it could have taken steps to ensure that Cassadaga achieved

# SPA51

COD in 2020, such as by talking through the delays with IRUS, assessing acceleration measures, and considering options for mitigation.  Tr. at 148:7-25.  Plaintiffs also suggest that they could have negotiated with IRUS to restructure the earnout payment to make acceleration economically viable and thereby avoid a total loss of the Milestone Payment.  *Id.* at 148:22.

The Court does not agree.  Trireme did not lack any timely information that caused it damage. IRUS told Trireme in April 2020 that Cassadaga's construction was a "dynamic situation" due to the COVID-19 pandemic and potential shutdowns.  Terra Firma's internal documents also show that, during this time, Plaintiffs were aware of the pandemic's impact and assessed Cassadaga's probability of obtaining COD in 2020 <u>at 0%.</u>  DX 259 at 3.  This document acknowledged that the Cassadaga Project "is expected to be delayed beyond this date [of December 31, 2020] in [the] current environment."  *Id.* at 6.  In other words, Trireme already understood that the project was expected to be delayed beyond 2020 regardless of any update from IRUS.  Despite this knowledge, Plaintiffs did not take any actions to assess acceleration measures or renegotiate the Merger Agreement.

Indeed, Trireme's arguments rely "on wholly speculative theories of damages" that do not connect the damage alleged – the loss of the Milestone Payments – with a breach under Section 7.6(b).  *Wilder*, 310 F. Supp. 3d at 446 (citation omitted).  Trireme does not clarify what steps it would have taken to speed up construction had it known more particulars of the project's status.  Nor is there evidence from which the Court concludes that Trireme could have done anything to accelerate the process.  Trireme does not point to any issue raised in the quarterly development report that it could have addressed had it received the report in July 2020 instead of in September 2020.  Indeed, earlier receipt would not have even confirmed IRUS's projected COD of 2021 for Cassadaga, which IRUS did not revise until later in September 2020.

At bottom, Trireme was not injured by any purported informational breach of

Section 7.6(b); rather, Trireme did not receive the Milestone Payment because the Cassadaga Project was not built until after 2020. Plaintiffs have failed to show that IRUS's lack of responsiveness was a "substantial factor" in causing the project to miss the December Milestone. *Coastal Power Int'l, Ltd.*, 10 F. Supp. 2d at 366 (citation omitted).

Therefore, Plaintiffs' breach-of-contract claim fails.

## III.   Joint and Several Liability Under the Parent Guarantee

Under the Parent Guarantee, Innogy "irrevocably and unconditionally guarantees . . . the payment when due of [IRUS's] payment obligations arising under the [Merger Agreement] Contract." Guarantee § 2.1. However, Innogy has no such liability obligations in this case to guarantee. Based on the Court's finding that IRUS did not breach the Merger Agreement directly or indirectly – and therefore owes Trireme no Milestone Payment – the Court grants judgment in favor of Defendants as to Plaintiffs' request for a declaratory judgment that Innogy is jointly and severally liable under the Parent Guarantee.

## CONCLUSION

When they negotiated the Merger Agreement in 2017, the parties did not anticipate that nearly four years would pass before the Cassadaga Project began generating power in western New York. Based on the evidence presented, this delay is not because one party tried, in bad faith, to cheat the other out of $69.7 million. It is instead the unfortunate result of a project plagued by delays from the start. Setbacks from before the Merger Agreement closed led to a tight construction schedule; a global pandemic that neither party anticipated compressed that schedule further; and construction delays and contractor issues combined with those factors to push the project's completion well into 2021. Disappointing, yes; bad faith, no.

**SPA53**

      For the reasons set forth herein, the Court concludes that Plaintiffs have failed to prove that IRUS breached the Merger Agreement's implied covenant of good faith and fair dealing. The Court also finds no breach of the parties' contract as to IRUS's reporting requirements. Therefore, the Court enters judgment in favor of Defendants on Plaintiffs' implied-covenant and breach-of-contract claims, as well as on Plaintiffs' related claim for a declaratory judgment regarding the Parent Guarantee.

      The Clerk of Court is respectfully directed to close the case.

Dated:  December 14, 2023
       New York, New York

                        SO ORDERED.

                        *Jennifer Rochon*
                        JENNIFER L. ROCHON
                        United States District Judge

## SPA54

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
TRIREME ENERGY HOLDINGS, INC. and
TRIREME ENERGY DEVELOPMENT, LLC,

|  |  |
|---|---|
| Plaintiff, | 20 **CIVIL** 5015 (JLR) |
| -against- | **JUDGMENT** |

INNOGY RENEWABLES US LLC and
INNOGY SE,

                              Defendant.
-----------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:**    That for the reasons set forth in the Court's Opinion and Order dated December 13, 2023, the Court concludes that Plaintiffs have failed to prove that IRUS breached the Merger Agreement's implied covenant of good faith and fair dealing. The Court also finds no breach of the parties' contract as to IRUS's reporting requirements. Therefore, judgment is entered in favor of Defendants on Plaintiffs' implied-covenant and breach-of-contract claims, as well as on Plaintiffs' related claim for a declaratory judgment regarding the Parent Guarantee. Accordingly, the case is closed.

**Dated:**  New York, New York
        December 14, 2023

                                        **RUBY J. KRAJICK**
                                        **Clerk of Court**

        **BY:**

                                _____
                                        **Deputy Clerk**